UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ERIC MITMAN,
Plaintiff,

v.

TRACY MITMAN,
ALICE CUPAIUOLO,
JANE (DOE),
HAYDEN MITMAN,
NANCY ZIEGLER,
MELISSA MITMAN,
ANN MITMAN,
FRANK MITMAN,
and DOES 1–10,
Defendants.


COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF

(JURY TRIAL DEMANDED)

Plaintiff Eric Mitman, by way of pro se complaint against Defendants, alleges as follows:

_____


I.   JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this civil action arises under the Constitution and laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968. Jurisdiction is further proper under 28 U.S.C. § 1343(a)(3), as Plaintiff seeks redress for the deprivation of rights secured by the Constitution and federal law.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), as a substantial part of the acts, omissions, and injuries giving rise to the claims occurred within this district, and all named parties reside in the State of New Jersey.

3. Plaintiff seeks declaratory, injunctive, compensatory, and punitive relief for violations of federal law and constitutionally protected rights, including those guaranteed by the Due Process Clause of the Fourteenth Amendment.

4. The acts complained of include but are not limited to the submission of falsified and manipulated evidence to a New Jersey court, conspiracy to deprive Plaintiff of his parental rights and employment protections through illegal and coordinated retaliation, and intentional infliction of emotional and reputational harm.

II.  PRELIMINARY STATEMENT

5. Plaintiff brings this civil action under 18 U.S.C. § 1962, alleging a coordinated and retaliatory racketeering scheme carried out by private individuals—including

Plaintiff's estranged spouse, her legal counsel, and certain family members—who conspired to fabricate allegations, manipulate law enforcement and judicial processes, and deprive Plaintiff of his parental, reputational, and economic rights through exploitation of institutional systems..

6. Civil RICO complaints are frequently dismissed not due to a lack of misconduct, but because of pleading deficiencies, failure to establish a qualified enterprise, or inadequate demonstration of predicate acts and resulting injury. This Complaint has been meticulously constructed to avoid those deficiencies. It presents a coherent, substantiated, and well-organized claim grounded in admissible evidence and supported by institutional records. The enterprise is clearly defined; the predicate acts are specific and repeated; the harm to Plaintiff's property, career, and protected relationships is concrete. This case satisfies the statutory requirements and survives the scrutiny that traditionally defeats improperly pleaded RICO claims.

7. Defendants, acting in coordination, engaged in a sustained pattern of racketeering activity that included the fabrication and submission of manipulated evidence to a New Jersey family court, the filing of knowingly false and retaliatory police reports, the concealment of exculpatory material, and the enlistment of third parties to participate in narrative construction, dissemination of disinformation, and obstruction of lawful parental access. These actions were not isolated incidents but formed part of a calculated strategy designed to weaponize public institutions, including the courts and law enforcement, to achieve unlawful personal and strategic objectives.

8. Through this coordinated enterprise, Defendants sought to manufacture a false narrative of abuse and fear, engineer Plaintiff's removal from the family residence, interfere with his security clearance and employment, alienate him from his children, and damage his standing in both personal and professional communities. The consequences have been severe: Plaintiff has endured reputational destruction, emotional trauma, financial destabilization, and the erosion of his fundamental rights as a parent and as a citizen.

9. This Complaint seeks compensatory and punitive damages, declaratory and injunctive relief, and full accountability for the unlawful conduct carried out under color of legal authority. Plaintiff brings this action not only to vindicate his own rights, but to expose and halt the systemic abuse of judicial and law enforcement mechanisms by private actors acting in concert for improper purposes.

10. Plaintiff does not allege that Defendants acted under color of law, but rather that they coordinated a private campaign of fraud and manipulation designed to exploit government institutions to deprive Plaintiff of constitutional rights.

## III. PARTIES

11. Plaintiff, Eric Mitman, is an adult residing at 129 1st Avenue, Glendora, New Jersey 08029. He is the biological father of two minor children and has served as the sole financial provider for many years, as well as the primary emotional caregiver throughout the marriage. He is employed as a federal contractor and holds a high-level security clearance, supported by a clean background and no history of violence or criminal conduct. Plaintiff initiated divorce proceedings in response to chronic dysfunction, emotional volatility, hyperdependence, and escalating misconduct by Defendant 1.

12. Defendant 1, Tracy Mitman, is Plaintiff's estranged spouse and the biological mother of his two minor children, as well as one additional child from a prior relationship. She resides at the same address as Plaintiff. Acting as the principal architect of the misconduct underlying this action, Defendant 1 orchestrated a calculated campaign of retaliation designed to dismantle Plaintiff's parental role, sabotage his professional standing, and inflict severe emotional and reputational harm. Her conduct included the fabrication and submission of falsified and edited evidence, the strategic manipulation of law enforcement processes, and the initiation of judicial proceedings grounded in falsehoods and intended to deprive Plaintiff of constitutionally protected rights.

13. Defendant 2, Alice Cupaiuolo, Esq., is an attorney licensed to practice law in the State of New Jersey. In her capacity as legal counsel to Defendant 1, Defendant 2 played a central and knowing role in furthering the racketeering enterprise. Upon information and belief, she directed or personally executed the editing and manipulation of audio evidence later submitted to law enforcement and the court, filed knowingly falsified materials in judicial proceedings, and authored retaliatory and deceptive legal correspondence under the guise of legitimate advocacy. She also ghostwrote—or coordinated the ghostwriting of—most text communications sent by Defendant 1 to Plaintiff after March 18, 2025, many of which included veiled or overt threats against Plaintiff. Defendant 2 repeatedly invoked her professional licensure to shield unlawful conduct from scrutiny and accountability. Her actions were not merely excessive advocacy—they were instrumental in executing a coordinated scheme to obstruct justice, deprive Plaintiff of due process, and lend a false appearance of legal legitimacy to a conspiracy rooted in fraud.

14. Defendant 3, Jane (DOE), is Plaintiff's cousin. Despite having full knowledge of the pending divorce proceedings and the escalating misconduct by Defendant 1, Defendant 3 willfully disregarded Plaintiff's explicit request to maintain neutrality. Instead, she aligned herself with Defendant 1 and has since maintained frequent, substantive communication with her. Defendant 3 has a known history of involvement in high-conflict divorce matters and has exhibited behavior consistent with coordinated interference. On or about April 19, 2025, during a family gathering, Defendant 3 physically inserted herself into Plaintiff's interactions with his youngest child in a manner reasonably perceived as both surveillance and deliberate disruption. Furthermore, Defendant 3 disclosed private and sensitive communications from Plaintiff to Defendant 1 and/or her legal representatives. Portions of these disclosures were subsequently used in court filings as part of Defendant 1's retaliatory litigation campaign, directly furthering the objectives of the racketeering enterprise.

15. Defendant 4, Hayden Mitman, is Plaintiff's biological brother. Despite having full awareness of the family's abusive dynamics and Plaintiff's expressly communicated boundaries, Defendant 4 knowingly aligned himself with Defendant 1. He disclosed selective and misleading private communications from Plaintiff to Defendant 1 and/or her legal counsel, which were subsequently used in court filings to distort Plaintiff's character and support the retaliatory litigation strategy. On or about Easter Sunday 2025, Defendant 4 hosted Defendant 1 at a family gathering from which Plaintiff was intentionally excluded—an act that furthered the ongoing campaign to isolate Plaintiff, undermine his familial relationships, and cause reputational damage. These actions materially advanced the objectives of the racketeering enterprise.

16. Defendant 5, Nancy Ziegler, is Plaintiff's maternal aunt. Despite having full knowledge of the volatile custody dispute and the misconduct being carried out by

Defendant 1, Defendant 5 knowingly participated in actions intended to deceive, isolate, and harm Plaintiff. On or about April 1, 2025, she authored a deliberately misleading group text message crafted to conceal Defendant 1's attendance at Easter Sunday's gathering, thereby frustrating Plaintiff's ability to enforce his stated parental boundaries. Defendant 5 subsequently disclosed Plaintiff's private communications, which were then used in court filings to support the retaliatory litigation strategy orchestrated by Defendant 1 and her Defendant 2. She remains in routine and substantive communication with Defendant 1 and has acted as an accessory in furtherance of the racketeering enterprise.

17. Defendant 6, Melissa Mitman, is the spouse of Defendant 4. Although not a blood relative of Plaintiff, she has actively facilitated the racketeering enterprise through both direct and indirect support. Defendant 6 hosted or participated in gatherings where coordination among Defendants occurred and maintained regular communication with Defendant 1 throughout the relevant period. On or about April 10, 2025—during the first police response to Plaintiff's residence—Defendant 1 identified Defendant 6 to officers as her "sister-in-law." Shortly after this interaction, Defendant 6 was among the first individuals Defendant 1 contacted, initiating a wave of outreach to other aligned family members. Her early inclusion and continued participation reflect her awareness of the conspiracy and her active role in furthering its objectives, including reputational, emotional, and legal harm to Plaintiff.

18. Defendant 7, an individual whose identity is presently unknown, is the registered user or principal operator of telephone number (609) 414-2107. This number is associated with hundreds of brief, high-frequency calls made and received during the core period of retaliatory activity and months leading up to it. Upon information and belief, Defendant 7 served as a covert coordinator within the racketeering enterprise, possibly participating in the editing, manipulation, and dissemination of digital evidence used to support fraudulent court filings. The precise role and identity of Defendant 7 will be established through subpoena, discovery, and forensic investigation. Their repeated and tightly clustered call activity indicates material involvement in the enterprise's strategic planning and execution.

19. Defendant 8, Ann Mitman, is Plaintiff's mother and a central historical source of emotional abuse and destabilization within Plaintiff's life. Despite receiving direct notice from Plaintiff regarding the ongoing harm caused by Defendant 1's conduct and the importance of maintaining neutrality during litigation, Defendant 8 authorized, enabled, and actively participated in acts of familial exclusion, reputational defamation, and emotional sabotage. Her actions—including facilitating Defendant 1's continued integration into family events while Plaintiff was expressly excluded—materially contributed to Plaintiff's psychological isolation, emotional distress, and reputational injury. These actions furthered the objectives of the racketeering enterprise and reflect a willful disregard for Plaintiff's constitutional and emotional rights.

20. Defendant 9, Frank Mitman, is Plaintiff's father and a resident of Pennsylvania. Despite being fully aware of the contentious nature of the legal proceedings and having received direct communications from Plaintiff regarding Defendant 1's misconduct, Defendant 9 failed to take any remedial action. Instead, he knowingly participated in gatherings and family coordination efforts that furthered the retaliatory campaign against Plaintiff. By disregarding Plaintiff's clearly stated boundaries and supporting the continued inclusion of Defendant 1 while excluding Plaintiff, Defendant 9 contributed to the psychological distress, reputational harm,

and familial isolation suffered by Plaintiff—thereby furthering the objectives of the racketeering enterprise.

21. Defendants DOES 1–10 are individuals whose identities are presently unknown but who, upon information and belief, materially participated in the racketeering enterprise described herein. These individuals are believed to have engaged in one or more overt acts in furtherance of the scheme, including but not limited to: editing or altering digital audio recordings, ghostwriting or contributing to fraudulent legal filings, transmitting false or defamatory information to law enforcement or judicial officers, and otherwise enabling the obstruction of justice and deprivation of Plaintiff's rights. Their identities and specific roles will be ascertained through formal discovery, including subpoenas, depositions, and forensic analysis.


IV.  THE ENTERPRISE

22.  Plaintiff alleges that Defendants, acting in coordination, formed an association-in-fact enterprise—hereinafter the Mitman-Cupaiuolo Litigation Enterprise—within the meaning of 18 U.S.C. § 1961(4), for the purpose of executing a sustained campaign of retaliation, reputational harm, and litigation abuse.

23.  The Enterprise is comprised of:

1.  Defendant 1, the Plaintiff's ex-wife, who acted as the operational lead, executing acts of fabrication, manipulation, and direct engagement with institutions.

2.  Defendant 2, legal counsel for Defendant 1, who ghostwrote communications, altered evidence, and filed knowingly false certifications in court.

3.  Defendant 3, Plaintiff's cousin, who has a personal history of high-conflict divorce and became one of Defendant 1's closest confidantes throughout the scheme. Defendant 3 engaged in extensive phone contact with Defendant 1 during key escalation periods, playing an emotional and strategic support role. Her consistent alignment and availability positioned her as a primary sounding board and narrative amplifier.

4.  Defendants 4 and 6, Plaintiff's brother and sister-in-law, acted as active enablers of Defendant 1's legal and emotional campaign. Despite Plaintiff's explicit boundaries and prior disclosures, both Defendants supported deceptive family gatherings that excluded Plaintiff while embracing Defendant 1. Defendant 4, in particular, provided private text messages authored by Plaintiff to Defendant 1, which were later used in court filings to support a false narrative. This betrayal—combined with their refusal to challenge the fabricated claims or offer support—directly advanced the broader scheme to discredit and isolate Plaintiff.

5.  Defendant 5, Plaintiff's paternal aunt, knowingly participated in the conspiracy by sending a deceptive message to conceal Defendant 1's presence at a family gathering, submitting a selectively framed message from Plaintiff that later appeared in court filings, and attending the gathering herself. She maintains regular phone contact with Defendant 1, reinforcing her active role in isolating Plaintiff and legitimizing a false narrative through coordinated silence and manufactured optics.

6. Defendant 7, identity presently unknown, believed to be a digital evidence handler or external ghostwriter operating as a central node in the creation, editing, and dissemination of falsified or misleading content.

7. The Mitman-Cupaiuolo Litigation Enterprise has a common purpose to:

    (a) fabricate a fear-based narrative around Plaintiff,

    (b) seize full custody and control of the children,

    (c) extract disproportionate financial compensation, and

    (d) damage Plaintiff's reputation, security clearance, and earning potential.

8. The Enterprise has continuity, having operated for a sustained period from approximately August 2024 through the present, engaging in repeated and coordinated acts designed to obstruct justice, submit falsified evidence, influence law enforcement, and mislead the family court system.

9. The Enterprise's activities involved the use of interstate commerce, including digital file transmission, phone calls across state lines, engagement with out-of-state court personnel, and electronic filings to government agencies.

10. Each Defendant knowingly conducted or participated in the affairs of the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), and conspired to do so in violation of § 1962(d).


## V.  FACTUAL BACKGROUND

24.  Plaintiff's Role in the Household

25. For much of the marriage, Plaintiff served as the sole financial provider, primary caretaker, and emotional foundation of the household. Although business travel in 2023 and a serious injury in 2024 temporarily limited his physical availability, Plaintiff continued to shoulder the full financial burden and remained the stabilizing presence in the family. Defendant 1, remained voluntarily unemployed for much and unlicensed throughout the entirety of the marriage, consistently relying on Plaintiff for all transportation, logistics, and adult responsibilities. He managed school drop-offs, grocery and household trips, medical appointments, and extracurricular transport— while maintaining full-time employment. Text messages confirm that Defendant 1 repeatedly promised to pursue employment and obtain a driver's license, yet never followed through.

26. Family Estrangement and Protective Boundaries

27. Plaintiff has been emotionally estranged from Defendants 3, 4, 5, 6, 8 and 9 due to a longstanding pattern of psychological invalidation, boundary violations, and familial abuse. Since at least August, 2024, communication has been minimal and largely superficial, with Plaintiff disengaging from further contact after repeated attempts to seek accountability were ignored or deflected.

28. On July 27, 2024, Plaintiff disclosed the full scope of his familial estrangement directly to Defendant 8, establishing clear protective boundaries to shield his children from similar harm. Defendant 1 verbally agreed to honor these boundaries and expressly assured Plaintiff that the children would not be left unsupervised around Defendant 8. Nonetheless, Defendant 4 later informed Plaintiff that he had learned of the conversation from Defendant 8 on July 20, 2024, and responded dismissively when confronted—telling Plaintiff he "needed to fix things" with Defendant 8. Shortly thereafter, Defendant 4 ceased all meaningful communication, aside from a brief birthday exchange and a brief message regarding fantasy football. To date, no named Defendant has contacted Plaintiff in any supportive or reconciliatory manner throughout the divorce process or its continuing aftermath. Plaintiff further asserts that these familial relationships have long been marked by inconsistency, lack of meaningful depth, alienation, and repeated boundary violations, as specifically outlined in Plaintiff's July 27, 2024 text conversation with Defendant 8.

29. Despite these assurances, Defendant 1 maintained inconsistent contact with Plaintiff's estranged family in the months leading up to date of file for divorce, and actively sought reintegration into their gatherings. On April 1, 2025, during the peak of of the escalation strategy, Defendant 5 sent a intentionally deceptive group text message to all familial Defendants including Defendant 1 stating Easter would be celebrated on Saturday April 19th. When Plaintiff informed Defendant 5 that he would not attend the family Easter Saturday event if Defendant 1 was present, she initially attempted to justify Defendant 1's inclusion. Only after Plaintiff unequivocally stated—multiple times—that he would not attend did Defendant 5 carefully reverse course, stating "for just this one year" she would ask Defendant 1 not to attend. Her hesitation and initial resistance reflect the broader familial alignment against Plaintiff and the calculated erosion of his protective boundaries.

30. To the best of Plaintiff's knowledge, he has not verbally spoken to any Defendant other than Defendants 1, 9, and 5 since the initiation of litigation. While limited text exchanges have occurred with certain Defendants—such as Defendant 4—Plaintiff has been otherwise excluded from meaningful dialogue. This breakdown in communication underscores the coordinated nature of Defendants' alignment and Plaintiff's resulting isolation.

31. Professional Background and Security Risk

32. Plaintiff holds a high-level security clearance in connection with his employment in a field that demands unwavering integrity and strict legal compliance. Following the false Domestic Violence harassment allegation initiated by Defendant 1 on March 15, 2025, Plaintiff was required to obtain counsel, notify his security office, submit an report, and provide regular updates as the matter progressed—placing both his employment and clearance status in jeopardy. The professional ramifications of Defendants' bad-faith legal targeting remain severe and ongoing.

33. Important Note:

34. Documented extensively in his private records and communications to his family law counsel, Plaintiff consistently and promptly relayed relevant developments—including clear patterns of misconduct, emotional abuse, third-party coordination, and manipulated evidence. Despite being fully informed, counsel repeatedly failed to provide meaningful remedy or strategic intervention. Plaintiff was told—on multiple occasions—that no adequate legal mechanisms existed to confront the

Defendants' ongoing campaign to destroy his way of life, suppress his parental rights, and undermine his emotional and professional stability. This institutional inaction not only deepened Plaintiff's vulnerability but also reinforced the Defendants' perception that their conduct would remain unchecked.

## VI.  STATEMENT OF FACTS

35. In August 2024, Plaintiff informed Defendant 1 that he was meeting with legal counsel to initiate divorce proceedings. Shortly thereafter, Defendant 1 began exhibiting unusually affectionate behavior and initiated frequent intimate contact—behavior inconsistent with the prior dynamic. On or about September 20, 2024, Plaintiff learned that Defendant 1 had already filed for divorce, despite having expressed strong aversion to the idea for over a year and a half. This discovery came only after Plaintiff's attorney transmitted an initial proposed settlement, revealing that Defendant 1 had concealed her legal actions while fostering a false appearance of reconciliation.

36. From late 2024 through early 2025, Defendant 1 initiated a deliberate campaign of entrapment, psychological manipulation, and covert evidentiary setup. Plaintiff began noticing a marked and unnatural shift in Defendant 1's language, including the repeated use of legal-adjacent phrases such as "routines," "boundaries," "spiraling," and "you're mad"—terminology she had never used prior in their nearly decade-long relationship. These rehearsed expressions later appeared verbatim in formal court filings, indicating that conversations were being scripted or coached with future litigation in mind. Phone records corroborate sustained and unusually frequent communication between Defendant 1 and Defendant 7 during this period, including in the months leading up to the March 9th escalation.

37. Plaintiff, having prior knowledge of common high-conflict divorce tactics, remained alert to signs of manipulation and evidence-gathering behavior. In early 2025, he began to observe a suspicious patterns in Defendant 1's conduct. She often stonewalled, interrupted frequently, and spoke over Plaintiff. These changes suggested that conversations were being covertly recorded and shaped for litigation purposes. Plaintiff had long resolved that if Defendant 1 ever stated she would "call the cops," he would cease all verbal communication to protect himself from manufactured escalation. That moment occurred on March 9, 2025.

38. Despite growing concerns over Defendant 1's shifting behavior, Plaintiff remained cooperative and accommodating in the weeks leading up to the March 9, 2025 incident. On three separately recorded occasions—February 13, 14, and 21, 2025—Plaintiff voluntarily drove Defendant 1, her oldest daughter, their son, and their daughter on errands at her request. These outings were family shopping trips, all of which were uneventful and cordial. Plaintiff's continued support during this period is further evidence that no genuine fear existed and that Defendant 1 was still relying on Plaintiff for daily logistics, transportation, and shared parenting responsibilities.

39. Call records reveal that Defendant 7 maintained unusually frequent, short-duration contact with Defendant 1 beginning no later than January, 2025. This pattern predates the March 9, 2025 escalation, and supports the inference that Defendant 7 was already playing a strategic role within the enterprise. The call activity, which aligns with known behavior signatures of evidence handlers, ghostwriters, or behind-the-scenes legal technicians, demonstrates that the retaliatory campaign was not a spontaneous response to Plaintiff's conduct, but rather a premeditated

scheme already underway prior to any police involvement, legal motion, or documented household conflict.

40. Throughout this period—and despite being the party who initiated the divorce—Defendant 1 consistently delayed progress and offered no viable pathway toward resolution. Over the entire course of litigation, only a single, unserious settlement proposal was submitted by Defendants 1 and 2, lacking good faith and failing to address core issues necessary for meaningful agreement.

41. Prior to March 9, 2025, Defendant 1 routinely removed the parties' daughter from the home without notifying Plaintiff of their destination or expected return time. While concerning, Plaintiff had resolved that such behavior would cease once the marriage formally ended, relying on Defendant 1's repeated assurances that she would co-parent respectfully. Following the March 9th incident, this pattern of unilateral removal briefly persisted. However, Plaintiff, through counsel, formally addressed the conduct as inconsistent with shared parental rights and obligations.

42. On March 9, 2025, Defendant 1 deliberately provoked a confrontation which she covertly recorded. The version of the audio later submitted to law enforcement and the court was selectively edited—omitting Plaintiff's efforts to de-escalate, references to his declining health caused by ongoing litigation stress, his direct statements calling out Defendant 1's victim posturing, and the moment he redirected the children to the kitchen, whom Defendant 1 followed voluntarily. Plaintiff asserts that the full, unedited recording—still withheld—would exonerate him and expose the calculated nature of Defendant 1's conduct. Despite its manipulated form, the edited audio was used in both criminal and family court filings.

43. Immediately following the March 9, 2025 incident, Plaintiff recognized that both his physical and legal safety were at risk. He began isolating himself in his designated living space to avoid Defendant 1 even more than previously, limiting his presence in shared areas to only brief and necessary transitions. To protect against further misrepresentation and preserve an accurate record of events, Plaintiff initiated frequent audio and video documentation of himself—resulting in a library of calm, loving interactions with his children and all encounters involving Defendant 1 during the critical escalation period. This practice remained in place until it became clear that the fabricated fear-based narrative had collapsed and the behaviors of Defendant 1 and her oldest daughter had reverted to their pre-March 9th pattern.

44. Upon recognizing Defendant 1's deliberate escalation—culminating in her stating she was "going to call the cops" during a March 9, 2025 conversation in which Plaintiff was pleading for cooperative resolution of the marriage—Plaintiff immediately ceased all verbal communication with her. To protect himself and preserve an accurate record of household dynamics, Plaintiff repositioned existing Ring cameras within the home. Despite later advancing claims of fear and harassment, Defendant 1, through counsel, requested the removal of these cameras—further contradicting the narrative of genuine concern and highlighting the performative nature of the allegations.

45. On or around March 9, 2025, Defendant 1 began unilaterally allowing guests to stay overnight while the children were present—behavior inconsistent with her prior conduct and appearing intended to portray a false narrative of needing protection. This violated Plaintiff's clearly stated boundary that no guests were permitted in the marital residence, which he solely owns and financially supports. Around this same

period, Defendant 1 also began leaving the home more frequently with Plaintiff's daughter and staying overnight at her parents' residence. Despite repeated attempts, she was largely unsuccessful in persuading Plaintiff's son to accompany her. Plaintiff's son appeared to recognize this pressure and consistently chose to remain in the home. Plaintiff regularly reassured his son that he was safe and free to make his own choice—highlighting the contrast between Defendant 1's coercive efforts and Plaintiff's support for the child's autonomy. These behaviors formed part of an apparent effort to construct a false image of household instability and fear while simultaneously undermining Plaintiff's bond with his children.

46. Immediately following the March 9th conversation, Defendant 1 began coercing the children to sleep in her room. Plaintiff noticed her oldest daughter seemingly enjoying the atmosphere as if it were a sleepover. In an audio recording, Plaintiff hears his son distressed and intends to tuck him into bed but when he arrives at his room Plaintiff notices he's laying on the floor of Defendant 1's room. When Plaintiff asks him why he's there, he states Defendant 1 orchestrated a deal for him to sleep in her room but he wants to go back to his room that Defendant 1 wasn't allowing him to.

47. The selectively edited March 9, 2025 recording—submitted by Defendant 1 in support of fabricated police reports and subsequent court filings prepared by Defendant 2—marked the final verbal interaction between Plaintiff and Defendant 1. From that date forward, Plaintiff has neither initiated nor engaged in any spoken conversation with Defendant 1. On only four isolated occasions, Plaintiff verbally communicated a single boundary phrase, such as "Please communicate with me through text," and otherwise maintained strict verbal silence. Given Defendant 1's known pattern of covert recordings, Plaintiff affirms with certainty that no additional verbal exchanges occurred, and that no legitimate recordings of any subsequent conversations between the parties exist.

48. Shortly after March 9, 2025, Plaintiff's son disclosed that Defendant 1 had asked whether he found Plaintiff "scary," in a manner that appeared suggestive and rehearsed. Concerned about the possibility of manipulated recordings or leading questions, Plaintiff calmly explained to his son the importance of honesty and caution in such moments—emphasizing that people might sometimes ask questions designed to elicit a specific answer. In response, Plaintiff's son expressed unprompted clarity and confidence, stating that next time he would respond by affirming that he is not afraid of Plaintiff and does not wish to be manipulated into saying otherwise.

49. On March 16, 2025, following a 23-minute phone call believed to have been between Defendant 1 and Defendant 2, Defendant 1 filed for a temporary restraining order (TRO) approximately 35 minutes later and made a police report based on knowingly false claims of harassment. Despite finding no criminal wrongdoing during the conducted investigation, the police proceeded with a domestic violence summary offense that remained pending for nearly two months and caused irreparable reputational harm.

50. Defendant 2, while acting under the color of her professional license as an officer of the court, either directly edited or knowingly submitted the manipulated March 9, 2025 audio recording as evidence. Plaintiff further asserts that Defendant 2 authored fraudulent certifications and pleadings containing knowingly false and perjured statements, thereby abusing her legal credentials to fabricate legitimacy. These acts transcend zealous representation—they constitute deliberate litigation

fraud intended to deprive Plaintiff of his liberty, financial resources, and parental rights. In doing so, Defendant 2 also materially contributed to the erosion of Plaintiff's children's constitutional and developmental rights to a relationship with their father, inflicting long-term emotional and psychological harm under the guise of legal process.

51. The Temporary Restraining Order (TRO) was ultimately dismissed by the Honorable Judge Trabosh, and a corresponding police investigation concluded that no criminal conduct had occurred. Nonetheless, Plaintiff was compelled to retain criminal defense counsel to respond to a falsified domestic violence summary offense — requiring a formal court appearance on May 6, 2025, where the charges were dismissed outright. Despite the dismissal, collateral consequences persist: on June 30, 2025, Plaintiff received a "Domestic Violence Initiative Offender Notice" from Lieutenant J. Fretz, reflecting the enduring stigma of the baseless accusation.

52. Even after the dismissal of the TRO, Defendant 1 escalated her psychological tactics by using the children to reinforce her narrative. She began forcing the youngest child to sleep in her room, removed her from Plaintiff's arms during bonding moments, and framed the downstairs area (where Plaintiff resided) and associated items as "dirty." These acts were designed to interfere with the child's emotional safety and sever the parental bond. She also told their son, "Don't speak to your father anymore about your feelings, instead speak to an aunt or uncle." Plaintiff documented the parental interference extensively.

53. Throughout this period, Defendants submitted false and misleading information to the court, describing lawful behavior as abusive, harassing, or controlling. These distortions were intended to deprive Plaintiff of access to his children, exclusive possession of the home, and professional standing, including potential suspension of his federal security clearance. In a letter to Defendant 2, Plaintiff's Family law counsel referred to Defendant 1 and 2's conduct in a letter to them as "transparent attempts to remove (Plaintiff) from the home."

54. On or around March 20, 2025, a sudden and unexplained shift occurred within the household: the two baby gates that had long restricted Plaintiff's youngest daughter from accessing his living space were inexplicably left open for the first time.

55. Shortly thereafter, Defendants 1 and 2 sent two conspicuously worded text messages asserting that "the baby gates have always remained open." These unprompted, out-of-context statements — delivered in unnatural legalistic phrasing — appear ghostwritten and were clearly designed to manipulate the record retroactively.

56. In Exhibit 1, Audio 1 — an audio clip believed to be recorded on or around March 7, 2025, and submitted to both law enforcement and the court by Defendants 1 and 2 — there is a distinct and recognizable sound of the baby gate closing at the end of the recording. Plaintiff conducted a digital forensic comparison using a control sample recorded in the home and confirmed that the acoustic profile of the gate closure was a match. This analysis conclusively demonstrated that the gate was closed by Defendant 1, directly contradicting Defendants' written assertions and exposing the falsified nature of their narrative.

57. This incident underscores the collusive efforts of Defendants 1 and 2 to fabricate evidence, manipulate perception, and obstruct the factual record. It forms part of a

broader pattern of coordinated deception and bad faith conduct.

58. Defendant 1's misrepresentations regarding the baby gates were not isolated. Although the gates had remained consistently closed since their younger daughter became mobile to control her movement, Defendant 1 falsely claimed in an April 3, 2025, text message: "I've always left the baby gates open for [our daughter] to have access to both of us, never restricting her time with you." Defendants 1 and 2 also falsely certified the same claim in their cross-motion reply.

59. This message was sent shortly after Defendant 1 forcibly removed Plaintiff's daughter from his arms while she was visibly drowsy and emotionally resisting separation—an incident Plaintiff captured in real-time via audio recording. The recording clearly documents the child's distress, Defendant 1's calculated tone where she mentions a bed time that never existed prior, and her use of rehearsed legal terminology. Plaintiff made only a single statement during the encounter: a calm request that all communication occur via text.

60. The message that followed falsely alleged that Plaintiff was interfering with a preexisting "bedtime routine"—despite no such routine having ever existed prior to March 9, 2025. This fabricated claim, contradicted by both lived history and the emotional authenticity captured in the recording, underscores the deliberate construction of Defendant 1's false narrative, intentional use of "routines" to limit Plaintiff's access to his children, and the emotional harm inflicted on the child as a result.

61. Discovery materials submitted shortly before April 3, 2025, by Defendants 1 and 2 falsely asserted that Plaintiff lacked a bond with his daughter—claims directly contradicted by the events of April 2 and hundreds of recorded, loving and caring, interactions.

62. Plaintiff documented repeated instances—through both audio and video—in which his daughter expressed a desire to stay with him, resisted being taken away, and emotionally broke down when forced to leave. Despite these clear indicators of trust and attachment, Defendant 1 continued to disrupt bonding and demonstrated a calculated pattern of parental alienation.

63. Defendant 1 also repeatedly used the parties' son as both a messenger and an emotional shield—placing him in the middle of adult conflict and assigning him inappropriate responsibility for her emotional state. Following a one-sided encounter that Defendant 1 initiated and intentionally escalated—despite Plaintiff not engaging or speaking to her—she later told their son that she had "slept badly" because he failed to protect her from Plaintiff. This manipulative statement came in response to the child's simple and polite question about her sleep. Plaintiff asserts that this tactic constitutes emotional abuse, burdening the child with guilt for circumstances beyond his control, and creating a psychologically destabilizing environment.

64. In mid-March, 2025, Plaintiff initiated a calm and empathetic conversation with Defendant 1's eldest daughter, who resided in the home throughout the marriage. In the weeks following the March 9 incident, Plaintiff observed increasingly performative behavior from her, including suddenly sleeping in Defendant 1's room as if it were a social event, immediately exiting any room Plaintiff entered, and interfering with Plaintiff's youngest daughter's access to him. These behaviors appeared influenced by Defendant 1's ongoing efforts to manufacture a fear-based narrative.

65. During the conversation, Plaintiff expressed concern about these dynamics and communicated that, she's safe, he loved her, he's never harmed her or anyone in the home, and that he's always been a protector to her and the family. His tone remained gentle and non-accusatory. This conversation marked the last time Plaintiff spoke with Defendant 1's eldest daughter out of concern for his own safety.

66. On April 1, 2025, Defendant 5 initiated a group text to all family members now named as Defendants, including Defendant 1, falsely claiming that Defendants 4 and 6 would be working on Easter Sunday and that the family gathering would instead occur on Saturday, April 19. Call logs show that most recipients were in active communication with Defendant 1 at the time and were likely fully aware of the ongoing legal escalations—including a pending domestic violence-related harassment charge and an active motion before the court. The message was deliberately crafted to deceive only Plaintiff.

67. In truth, a full Easter Sunday gathering was held on April 20, 2025, at the home of Defendants 4 and 6, and attended by Defendants 1, 3, 4, 5, 6, 8, and 9—along with Plaintiff's minor children. This took place in direct violation of Plaintiff's clearly communicated protective parenting boundaries concerning the children's exposure to members of his estranged family. While Defendant 1 may not have fully grasped the depth of Plaintiff's history with his family, Plaintiff remained deeply alarmed by the recklessness of these exposures, particularly in light of the active legal conflict.

68. Plaintiff only learned of the gathering after his son casually mentioned it days earlier, followed by a confirming and clearly ghostwritten message from Defendant 1 on April 19. No recipient of the original group message made any attempt to correct or clarify the deception. This incident demonstrates coordinated manipulation, intentional misrepresentation, and calculated emotional harm—further evidencing a broader scheme to isolate Plaintiff and reinforce a false narrative to the court.

69. From March 9 onward, Plaintiff intentionally avoided all verbal contact with Defendant 1 and significantly limited his presence in shared spaces. His conduct throughout this period remained consistently calm, with video and audio documentation serving both as protection and evidence of his non-threatening, non-aggressive demeanor. This evidence directly contradicts any later suggestion by Defendant 1 that she was in fear or experienced harassment.

70. On the morning of April 10, 2025, Plaintiff's first encounter with Defendant 1 occurred at 7:30 AM, Defendant 1 approached Plaintiff while he was seated in the family room with his daughter on his side sharing a blanket with her. Plaintiff was filming himself with the front-facing camera, anticipating a potential confrontation due to highly suspicious intentional escalations by Defendant 1. Without provocation or verbal engagement from Plaintiff, Defendant 1 stated aloud, "(Plaintiff) can you please stop recording me, it's becoming harassment," despite the fact that Plaintiff had not spoken to or made any indication he was recording at all.

71. Plaintiff continued recording throughout the morning and captured a total of four separate videos between 7:30 AM and the time of police arrival. All videos show Plaintiff calm and interacting with his children. In another video—recorded during police presence—Plaintiff can be heard telling his son, who was with Plaintiff the entirety of the morning and chooses to spend the overwhelming majority of his time with Plaintiff, "You shouldn't have to go through this," to which his son replies, "No,

you shouldn't have to go through this." This exchange, captured on video, reflects both the emotional toll on the children and the broader dynamic of weaponized false fear tactics being used against Plaintiff.

72. During the police response—captured on body-worn camera footage—Defendant 1 falsely claimed that Plaintiff was refusing to allow her to leave the home with their daughter. In reality, no such conversation or interaction had taken place. The only statement made by Defendant 1 prior to the officer's arrival was a baseless threat to report Plaintiff for harassment. When questioned by the responding officer as to whether she was attempting to leave, Defendant 1 contradicted her earlier assertion by stating that she was still waiting for her ride. The responding officers left after finding no validity to the accusations.

73. Immediately following the unsuccessful attempt by Defendant 1 to provoke Plaintiff's removal from the home, Plaintiff documented a sustained and highly coordinated communication blitz carried out by Defendant 1 across law enforcement, legal counsel, aligned family members, domestic violence support systems, and court-related institutions. The call patterns reflect intentional racketeering activity, designed to fabricate urgency, trigger institutional responses, and fortify a premeditated custody and litigation campaign against Plaintiff.

74. At 7:25 AM and again at 7:27 AM, Defendant 1 placed two consecutive calls to the local police department's non-emergency line. Officers arrived on scene at approximately 7:52 AM and, after conducting a welfare check and speaking with Plaintiff, declined to take any enforcement action—finding no cause for concern or legal justification for escalation.

75. Rather than de-escalate, Defendant 1 immediately placed a phone call at 8:15 AM to (609) 970-6051—believed to belong to Defendant 2. The call lasted one minute and marked the beginning of a day-long, multi-party coordination effort. This sequence of communications reflects a broader pattern of coordinated activity conducted across multiple channels and with apparent third-party assistance. This pattern directly advanced the Defendants' shared objectives and forms a central pillar of Plaintiff's legal claims.

76. At 8:41 AM, Defendant 1 placed a call to a Camden County domestic violence support line, likely one of the local Women's Shelters. This call occurred less than an hour after police declined to take action. It reflects a strategic pattern of third-party escalation through indirect accusations, often used to establish legal standing in custody conflicts when direct allegations have failed.

77. Between 8:49 AM and 9:30 AM, Defendant 1 placed and received the following calls, indicating immediate family coordination and message alignment:

1. 8:49 AM – Outgoing call to Defendant 6
2. 8:53 AM – Outgoing call to Defendant 8
3. 8:57 AM – Incoming 14-minute call from a blocked number (potentially a legal or institutional contact)
4. 9:13 AM – Outgoing call to 609-970-6051, likely Defendant 2
5. 9:18 AM – Incoming 10-minute call from Defendant 8
6. 9:30 AM – Outgoing 2-minute call to Defendant 4

78. These clustered communications reflect an effort to rapidly activate familial loyalty, align public messaging, and potentially pre-stage affidavits or statements in support of upcoming filings.

79. At 11:06 AM, Defendant 1 received an incoming call from 856-650-9195—a number associated with Camden County's Probation or Child Support Unit—for 18 minutes. The timing of this call, directly following her family coordination blitz, suggests an escalation to institutional leverage and financial pressure as an additional vector of litigation-based harm.

80. At 11:49 AM, Defendant 1 received a 20-minute call from Bristol County Probate and Family Court.

81. Defendant 1 continued calling (potentially) Defendant 2's number repeatedly throughout the afternoon, with logged calls at:

    1.  12:09 PM (1 minute)
    2.  4:04 PM (3 minutes)
    3.  4:25 PM (8 minutes)
    4.  4:47 PM (12 minutes)

82. These frequent, short-duration legal calls match the known pattern of off-the-record legal coaching and real-time narrative development during filing preparation.

83. Simultaneously, Defendant 1 expanded her outreach to Defendant 3, beginning with a 36-minute call at 12:21 PM, followed by another call at 4:33 PM. These extended durations suggest direct coordination of surveillance efforts and the transfer of sensitive information to later weaponized in court.

84. Defendant 7, whose identity remains unknown, appears at the following timestamps:

    1.  2:43 PM – Incoming
    2.  2:58 PM – Incoming
    3.  5:45 PM – Outgoing (4 minutes)
    4.  7:40 PM – Incoming (2 minutes)
    5.  8:13 PM – Outgoing (1 minute)

85. This single-day chronology represents a deliberate and well-orchestrated operation, leveraging legal counsel, family accomplices, evidence fabricators, and institutional contacts in rapid succession. The outreach pattern, tight call clustering, and targeted agency contacts reflect neither fear nor emotional spontaneity, but a premeditated weaponization of procedural systems designed to remove Plaintiff from the home, alienate him from his children, and entrench a false narrative in judicial and public records.

86. On April 15th, Defendant 1 calls Camden County Domestic Violence Center at 2:29 PM and her last call of the night is from Defendant 6 at at 8:32 PM for 8 minutes.

87. During this time, as Plaintiff was isolating for his safety, Defendant 1 retained responsibility for the children's meals and imposed an unusually rigid 6:00 PM dinner time—down to the minute. This sudden and drastic shift from prior patterns created documented confusion and discomfort for the children. On April 16, 2025, Defendant 1 left the home unusually late and texted that she would "be back around

dinner time." Despite it being her designated responsibility to provide the children's meals, she failed to return before 6:00 PM. To prevent any potential manipulation of the situation, Plaintiff informed his son at approximately 5:00 PM that he would be preparing dinner. Around 5:50 PM, Plaintiff went upstairs to the kitchen and observed Defendant 1's eldest daughter already preparing food, with portion sizes indicating she may have been cooking for more than just herself. Plaintiff again checked in with his son, confirming whether he still planned to eat the meal Plaintiff was preparing. His son, smiling proudly, responded, "I'm having what you're making."

88. Defendant 1 returned to the residence at approximately 7:10 PM and—according to Plaintiff's son, who found the behavior unusual—ignored his attempt to greet her at the door and instead went directly upstairs to her eldest daughter's room. At approximately 7:48 PM, while Plaintiff's son was already in bed, police once again arrived at the marital residence. According to dispatch logs and body-worn camera footage, the visit was prompted by a call placed by Defendant 1, who reported that "her husband [was] neglecting their 13-year-old daughter."

89. Upon information and belief, Defendant 1 deliberately mischaracterized routine conduct—specifically, the child independently preparing her own dinner—as neglect, in an effort to manufacture concern. This followed an earlier self-protective period of estrangement between the child and Plaintiff, which arose after the March 9 dispute. The underlying motive for the report appears to have been to fabricate a record of mistreatment that could later support claims for child support related to a child not biologically Plaintiff's. In their May 19, 2025 filing, Defendants 1 and 2 certified that law enforcement was contacted merely to "seek guidance" and that they "did not ask the police to speak to or involve [Plaintiff]." Further, phone records reflect conspicuously synchronized activity among Defendants 2, 3, 4, 6, and 7, reinforcing the conclusion that this call was strategically coordinated to provoke law enforcement involvement under false pretenses.

90. In a one time phone call at 3:44 PM on April 17, 2025, during the peak of of the escalation strategy, Plaintiff informed Defendant 5 that he would not attend the family Easter Saturday event if Defendant 1 was present, she initially attempted to justify Defendant 1's inclusion. Only after Plaintiff unequivocally stated—multiple times—that he would not attend did Defendant 5 carefully reverse course, stating "for just this one year" she would ask Defendant 1 not to attend. Her hesitation and initial resistance reflect the broader familial alignment against Plaintiff and the calculated erosion of his protective boundaries. Plaintiff later learned that Defendant 1 and Defendant 5 spoke for 44 minutes shortly before their call at 1:53 PM.

91. On April 19, 2025, Plaintiff attended the Easter gathering hosted by Defendant 5 and attended by Defendants 3, 4, 6, 8, and 9. Aware of Defendant 1's ongoing call activity with multiple attendees—and Defendant 5's demonstrated lack of support in a prior phone conversation—Plaintiff remained on heightened alert throughout the event.

92. For his safety, he avoided all verbal interaction with Defendant 3, despite her repeated and inappropriate interference with his time parenting his daughter. Defendants 4 and 6 also made deliberate efforts to avoid him, never once acknowledging his presence. Only Defendants 5 and 9 exhibited any behavior that could be construed as inclusive or communicative. Still, no one expressed concern, offered support, or acknowledged the legal and emotional hardship Plaintiff was facing.

93. The day held unique significance for Plaintiff: it marked the first time since his daughter's birth that he was permitted—by necessity of counsel involvement—to take her anywhere without Defendant 1 accompanying them. Due to Defendant 1's long-standing refusal to work or obtain a driver's license, she had maintained exclusive, round-the-clock physical control over their daughter, rarely allowing Plaintiff even brief moments of unsupervised care.

94. Despite this being the first such opportunity, the children behaved exceptionally well throughout the day. Both appeared to sense the underlying hostility present at the gathering and repeatedly gravitated toward Plaintiff—seeking his presence, affection, and emotional safety. Plaintiff's daughter, in particular, remained close to Plaintiff for nearly the first three hours, venturing off only after Defendant 3 ceased attempting to remove her from Plaintiff's care and efforts to interfere with their time together.

95. Shortly following the gathering, Plaintiff's son, unprompted, said: "I don't know why Mom and everyone else treats you so badly—you don't do anything wrong."

96. On the morning of April 20, 2025, Plaintiff sent emotionally vulnerable messages to Defendants 4 and 8, expressing concern about the ongoing false narrative, warning of legal impact, requesting support, and pleading for neutrality. Neither responded. Both proceeded to attend the gathering with Defendant 1, who at the time was, and is currently, actively engaged in a coordinated litigation and false police reporting campaign designed to strip Plaintiff of his parental rights and irreparably damage his reputation.

97. Although no response was received, Plaintiff observed an immediate shift in the behavior of Defendant 1 and her eldest daughter following the Easter gathering. The previously contrived display of fear abruptly ceased, and the household atmosphere noticeably calmed.

98. This alienation pattern continued on July 19, 2025, when Defendants 4 and 6 again hosted a family gathering again attended by Defendant 1 and Plaintiff's children. This occurred despite Plaintiff having lawfully and unequivocally communicated to Defendant 1 — via text on July 18 — that his children were not to be exposed to his side of the family due to their involvement in a broader campaign of defamation, alienation, and emotional abuse. Defendant 1 willfully violated this protective parental boundary, once again exposing the children to Defendants 3, 4, 5, 6, 8, and 9, reflecting both contempt for Plaintiff's lawful authority and a reckless disregard for the children's emotional well-being.

99. On April 20, 2025, Plaintiff sent written messages to both his mother and brother explicitly warning them that a one-sided narrative was being advanced without verification, and that remaining silent or appearing aligned with Defendant 1 risked serious legal and emotional consequences for the children. Plaintiff requested only neutrality, not loyalty. No member of Plaintiff's family ever responded to dispute these warnings or to verify the facts, and yet were later referenced by Defendants 1 and 2 in their May 19, 2025 cross-motion reply as if they corroborated the abuse narrative. This evidences a coordinated attempt to manufacture false support for a litigation strategy aimed at isolating and discrediting Plaintiff.

100. On May 26, 2025, Defendants 1 and 2 submitted a sworn statement in their cross-motion in FM-04-246-25, asserting that "Defendant's family, including his parents

and siblings, are aware of the events that occurred during that period." This reference signals a deliberate intent to rely on Plaintiff's estranged family members —including Defendants 4 and 8—as corroborating witnesses, despite their lack of first-hand knowledge and their negligible involvement in Plaintiff's life. Plaintiff had previously warned these individuals of the emotional and legal consequences of supporting a false narrative. Nevertheless, they made no effort to disavow the claims or distance themselves from the litigation. Their continued silence and voluntary association with Defendant 1—combined with their verified mention as potential validators—reflect a willful alignment with the broader campaign of defamation, alienation, and reputational harm.

101. On the evening of May 22, 2025, Plaintiff and Defendant 1 entered into a Consent Agreement—executed to avoid an imminent motion hearing—which required that all communication between the parties occur exclusively through the court-sanctioned application AppClose. Less than 24 hours later, shortly before 12:40 PM on May 23, 2025, Defendant 1 entered Plaintiff's private living space and verbally asked if he wanted Taco Bell. Plaintiff immediately reminded Defendant 1 to communicate through AppClose and contemporaneously documented the boundary and Consent Agreement violation within the application.

102. The resulting AppClose message thread not only captures this breach in real time, but also evidences a broader, ongoing campaign of manipulation, parental interference, emotional coercion, and legal intimidation. Defendant 1's responses— believed to have been ghostwritten by Defendant 2 or Defendant 7—exhibit legalistic language, strategic deflection, and calculated narrative control, all intended to discredit Plaintiff and minimize accountability. Taken in full, the correspondence demonstrates both the collapse of Defendants' fabricated narrative and the emotional damage being inflicted on the children through the persistence of these abusive litigation tactics.

103. This coordinated campaign caused Plaintiff extreme emotional distress, as he increasingly feared the gradual loss of his most cherished relationships—those with his children. With no meaningful support system remaining among his extended family, Plaintiff views his children as the only stable family he has. The fear of being isolated from them, combined with the relentless manipulations of the Defendants, produced lasting psychological harm and deepened the trauma inflicted by the broader conspiracy.

104. From May 23, 2025, Plaintiff has continuously battled to reclaim his rightful parental role, safeguard the children from ongoing psychological manipulation, and expose both familial dysfunction and third-party interference—particularly that coordinated by Defendants 1 and 2. Through AppClose, Plaintiff has persistently advocated for the children's emotional safety and safeguarding their instinctual autonomy: the uncoached, reflexive expressions of preference, trust, and resistance to coercive control that children demonstrate when left free from manipulation.

105. Some notable AppClose messages and submissions include:

- 5/23/2025, 5:20 PM – Plaintiff sets clear family boundaries.

- 5/25/2025, 12:31 PM – Plaintiff details Defendant 3's behavior on April 19, 2025, and reiterates a parental boundary.

- 5/29/2025, 8:58 AM – Plaintiff asserts that Defendant 2 is ghostwriting Defendant 1's messages; no denial is issued.

- 6/1/2025, 9:26 AM – Plaintiff addresses parental alienation and emotional abuse.

- 6/3/2025, 8:23 AM – Plaintiff responds to Father's Day message; opposing party replies with an insulting message.

- 6/4/2025, 8:28 AM – Plaintiff reasserts the parental boundary regarding family involvement.

- 6/9/2025, 9:36 AM – Plaintiff advocates for the children and documents continued alienation.

- 6/9/2025, 7:00 PM – Plaintiff outlines a timeline demonstrating police coordination.

- 6/10/2025, 1:00 PM – Plaintiff explains the impact of ongoing alienation on child development.

- 6/15/2025, 4:28 PM – Plaintiff confronts Defendant 1's refusal to work, drive, or engage positively with the children.

- 6/18/2025, 9:00 AM – Plaintiff confronts the edited audio recording submitted to police and court; no denial is issued.

- 6/30/2025, 12:09 PM – Plaintiff directly challenges the coordinated legal effort; no denial is issued.

- 7/6/2025, 5:17 PM – Plaintiff documents an act of inappropriate sexual provocation by Defendant 1.

- 7/19/2025 9:43 AM - Defendant 1 informs of gathering with familial defendants. Plaintiff responds setting clear lawful boundary. Boundary is ultimately ignored.

- 7/20/2025 11:53AM - Plaintiff documents the exposure

106. As the narrative unraveled daily via AppClose, the environment in the home became less hostile.

107. On June 18, 2025, Plaintiff's counsel, Thomas Roberto, Esq., issued a formal letter to Defendant 2, directly refuting her repeated accusations that Plaintiff had engaged in "abusive, harassing, belittling, and bullying conduct" in violation of a Consent Order. Mr. Roberto unequivocally stated that these allegations were "not true," and condemned the underlying legal actions—specifically, the filing of a temporary restraining order and the involvement of law enforcement—as "baseless" and predicated on "false police reports." He affirmed that the AppClose messages in question contained no conduct remotely approaching abuse, but rather showed "two individuals attempting to co-parent."

108. Mr. Roberto further emphasized that Plaintiff had been forced to record interactions solely for protection, citing an incident in which Defendant 1 physically removed the parties' sleeping daughter from Plaintiff's lap—conduct that was coercive, not protective. Notably, Defendant 2 never responded to or contested any aspect of this letter. Her silence, in the face of an unambiguous legal repudiation, underscores her

complicity in knowingly advancing false claims, misrepresenting material facts to the court, and weaponizing the legal system for strategic gain. This conduct constitutes not only a violation of her ethical obligations under RPC 3.3 (Candor Toward the Tribunal) but also supports the claims herein of honest services fraud under 18 U.S.C. § 1346 and racketeering activity under 18 U.S.C. § 1961(1)(B).

109. On July 6, 2025, following the collapse of her legal narrative, Defendant 1 made a sexually suggestive attempt to provoke Plaintiff. She entered his private space wearing only bathing suit bottoms and an open robe that exposed her chest, and verbally asked for assistance fixing her swimsuit top. Plaintiff, without responding verbally, briefly inspected the top, found nothing wrong with it, and returned it to her.

110. Defendant 1 then approached and stood at the foot of Plaintiff's reclined chair—a position she had historically used to initiate sexual contact by physically climbing onto him. Recognizing this familiar and inappropriate advance, Plaintiff immediately began reaching for his phone to document the interaction. Defendant 1 quickly walked away but paused near the stairs, stating that she still needed help tying her swimsuit. Plaintiff remained silent and shook his head side to side, clearly and emphatically signaling his refusal. Upon witnessing this nonverbal rejection, Defendant 1 exited Plaintiff's living space.

111. This interaction reflects Defendant 1's continued use of sexually suggestive conduct to provoke or manipulate Plaintiff, even amidst ongoing litigation and despite her previous conduct and court-ordered communication restrictions.

112. On July 19, 2025, Defendants 4 and 6 hosted yet another family gathering, attended by Defendant 1 and Plaintiff's minor children. This occurred in direct violation of Plaintiff's clearly articulated and lawfully asserted parental boundary—reaffirmed via text message to Defendant 1 on July 18, 2025—which expressly prohibited exposing the children to members of Plaintiff's estranged family due to their documented involvement in litigation misconduct, defamation, emotional abuse, and ongoing alienation efforts. Despite this, Defendant 1 willfully disregarded Plaintiff's directive and knowingly exposed the children to Defendants 3, 4, 5, 6, 8, and 9. Her conduct reflects not only a deliberate act of contempt toward Plaintiff's lawful parental authority, but also a reckless indifference to the children's emotional safety and well-being.

113. Defendants 3, 4, 5, 6, 8 and 9 coordinated with Defendant 1 during this campaign. Despite years of limited or no contact, they provided Defendant 1 with private messages, background details, and emotional support. They hosted her and the children at holiday events from which Plaintiff was deliberately excluded, despite full knowledge that Defendant 1's claims were unproven and likely false.

114. In a certified statement submitted to the court on May 19, 2025, Defendant 1—via Defendant 2—expressly asserted that "even Plaintiff's family, including his parents, are aware of the events of this period." This admission is materially significant, as it demonstrates that Defendants deliberately involved Plaintiff's estranged family in the coordinated legal campaign against him. Rather than serving as passive observers, these family members were made aware of specific litigation events and briefed on how to describe Plaintiff's historical behavior in a manner favorable to the Defendants' narrative. This acknowledgment directly rebuts any assertion that Defendants 3, 4, 5, 6, 8, and 9 acted independently or without knowledge of the

escalating legal conflict. It confirms that they were either kept informed by or actively coordinated with those driving the litigation strategy.

115. By Defendant 1 and 2's own words, Plaintiff's family was not only aware of the underlying allegations but was intentionally brought into the fold to amplify a false narrative. This coordination directly implicates Defendants 3, 4, 5, 6, 8, and 9 in the civil conspiracy and demonstrates that their actions—ranging from deceptive communication to the emotional manipulation of Plaintiff's children—were not isolated or incidental. Rather, they formed part of a broader pattern of conduct designed to isolate Plaintiff, legitimize provably false claims, and emotionally destabilize him through the strategic involvement of his remaining familial ties. This integration of third parties into the litigation effort supports the existence of an "enterprise" under applicable civil conspiracy and civil RICO theories.

116. Plaintiff's estrangement from his family had been long-standing due to repeated boundary violations and lack of support. Nevertheless, their sudden allegiance to Defendant 1 during litigation—despite never inquiring about the truth of the claims—served to validate her narrative and further alienate Plaintiff from his children during crucial developmental stages.

117. Throughout the litigation period—and despite the coordinated efforts of all Defendants to dismantle his personal and professional life—Plaintiff remained the sole financial provider, quite literally funding Defendant 1 as she advanced this orchestrated campaign against him. He was the only licensed driver, the emotional cornerstone of the household, and the one sustaining full-time employment as a federal contractor. Plaintiff managed all household logistics, served as the children's primary source of comfort and emotional stability, and maintained exclusive responsibility for the family dog, which Defendant 1 had always refused to care for unless absolutely necessary. In defiance of these undisputed contributions, Defendants collectively sought to recast Plaintiff as volatile, abusive, and unfit—relying on a narrative constructed through distortion, omission, and bad-faith mischaracterizations that bore no resemblance to the to the documented household dynamics, in which Plaintiff provided financial, emotional, and logistical stability.

118. The totality of Defendants' conduct—including false filings, selective evidence, perjured statements, emotional manipulation, coordinated gatherings, covert surveillance, and ghostwritten messaging—resulted in extraordinary harm to Plaintiff's mental health, reputation, financial stability, and parental role. The psychological damage inflicted upon the children was not incidental but rather the foreseeable outcome of sustained interference, narrative engineering, and invasive monitoring designed to control and distort their perception of Plaintiff.

119. Plaintiff has learned from his son that Defendant 1 unilaterally contacted the school guidance counselor without Plaintiff's knowledge, consent, or participation. The nature and content of that communication remain undisclosed, raising serious concerns about how Plaintiff and the family dynamic may have been portrayed. Plaintiff has received no notification from the school, and it remains unknown whether additional institutions, healthcare providers, or professionals were similarly contacted or misled. Discovery will be essential to uncover the full scope of these third-party interactions and to determine whether they were used to propagate the Defendants' coordinated campaign to undermine Plaintiff's parental rights, legal standing, and personal reputation.

120. Despite months of coordinated efforts to criminalize, destabilize, and sever Plaintiff's relationship with his children, Defendants 1 and 2 ultimately agreed to settlement terms on July 8, 2025. Notably, the agreement included no requests for custody restrictions, supervisory conditions, or limitations on Plaintiff's parental rights—directly undermining the fear-based narrative advanced by Defendants throughout litigation, including representations to law enforcement and the courts. In fact, Defendant 1 affirmatively requested to retain access to the marital property for the purpose of child exchanges, further highlighting the absence of any legitimate safety concern.

## VII. PREDICATE ACTS

121. **Predicate Act 1:** Submission of Materially Altered Audio Recording to Law Enforcement and Family Court in Furtherance of Retaliatory Legal Action

122. On or about March 9, 2025, Defendant 1 recorded an audio interaction with Plaintiff during a domestic discussion. Defendant 2, acting as Defendant 1's legal counsel, either directly edited, directed the editing of, or knowingly submitted a materially altered version of that recording to law enforcement and family court officials.

123. The submitted recording excluded exculpatory statements by Plaintiff, including clear efforts to de-escalate, deteriorating health conditions due to Defendant 1's conduct, her victim posturing, and redirection to the children. These omissions substantially changed the nature and tone of the interaction and falsely attempted to portray Plaintiff as volatile and threatening.

124. The falsified version was subsequently used to:

- Initiate a police investigation,
- Support an application for a Temporary Restraining Order (later denied),
- Justify the filing of a domestic violence summary offense (later dismissed),
- And bolster a family court motion to remove Plaintiff from the marital home.

125. These actions were not isolated, but taken in furtherance of an ongoing enterprise to construct a false legal narrative and deprive Plaintiff of his liberty, professional standing, and parental rights.

126. This conduct constitutes racketeering activity under:

- 18 U.S.C. § 1503 – Obstruction of justice (through misleading the court and law enforcement),
- 18 U.S.C. § 1343 – Wire fraud (where the altered file was transmitted electronically),
- 18 U.S.C. § 1621 – Perjury (if incorporated in sworn filings),
- 18 U.S.C. § 1961(1)(B) – Predicate act for purposes of establishing a RICO pattern.

127. **Predicate Act 2:** Abuse of Legal Authority and Honest Services Fraud by Defendant 2 to Legitimize Falsified Filings and Conceal Evidence Tampering

128. Between March and May 2025, Defendant 2, acting under the color of her professional licensure and in active legal representation of Defendant 1, knowingly

and willfully submitted materially false and misleading filings to the court. These included:

- Discovery responses,
- A motion to remove Plaintiff from the marital residence,
- A cross-motion and supporting certification,
- A proposed consent order, and
- Correspondence with opposing counsel.

129. Each of these filings contained misstatements, falsified narratives, or omitted exculpatory information, forming the backbone of a fraudulent legal campaign designed to damage Plaintiff's parental rights, professional standing, and legal credibility.

130. Specifically, Defendant 2:

- Submitted the manipulated audio recording identified in Predicate Act 1, knowing it omitted exculpatory and de-escalatory statements by Plaintiff.

- Directed or ghostwrote communications on behalf of Defendant 1—including AppClose and text messages—crafted to incite conflict and create a distorted evidentiary trail while shielding Defendant 1's own misconduct.

- Repeatedly failed to amend or correct falsehoods, even after Plaintiff raised the alarm regarding the altered audio and other demonstrable misrepresentations.

- Advanced a legal strategy rooted in deceit, including suppression of evidence, false narratives submitted under certification, and anticipated reliance on dishonest or coached testimony to obtain child custody leverage and financial gain.

131. Defendant 2's misuse of her legal authority and breach of ethical obligations constitute a knowing violation of her duty of candor to the tribunal and to the legal profession itself.

132. This conduct constitutes racketeering activity under:

- 18 U.S.C. § 1341 – Mail fraud (where filings or correspondence were delivered by U.S. mail),
- 18 U.S.C. § 1343 – Wire fraud (for digital submissions and email transmissions),
- 18 U.S.C. § 1346 – Honest services fraud (through breach of legal ethical duties),
- 18 U.S.C. § 1961(1)(B) – Racketeering predicate acts under RICO.

133. By weaponizing her legal license to promote and legitimize a knowingly fraudulent litigation campaign, Defendant 2 materially furthered a coordinated criminal enterprise designed to strip Plaintiff of constitutional protections, professional integrity, and access to his children.

134. **Predicate Act 3:** Weaponization of Law Enforcement and Abuse of Legal Process to Fabricate a False Record of Threat and Instability

135. Between March 15 and April 16, 2025, as detailed in the Statement of Facts, Defendant 1, in coordination with Defendant 2 and in ongoing communication with

Defendants 3 through 8, knowingly and repeatedly engaged law enforcement under false pretenses. These coordinated actions were executed with the intent to:

• Create a false pattern of "police involvement" in the absence of any actual threat or unlawful behavior;

• Undermine Plaintiff's security clearance and professional standing through reputational damage;

• Isolate Plaintiff from his children and justify restrictions on access;

• Generate fabricated evidence for use in civil protective orders, custody proceedings, and public record narratives.

136. Each incident was knowingly baseless, and law enforcement consistently found no criminal activity, no threats, and no basis for intervention. Nevertheless, these contacts were later cited in family court filings and correspondence by Defendant 2 as justification for custody interference, household removal, and enhanced legal restraints—despite the absence of any underlying misconduct.

137. This deliberate misuse of public law enforcement resources to establish a false evidentiary record constitutes an abuse of legal process and a pattern of obstruction intended to interfere with Plaintiff's liberty interests, career, and constitutional parental rights.

138. This conduct constitutes racketeering activity under:

• 18 U.S.C. § 1503 – Obstruction of justice (by using false reports to build a fraudulent record),
• 18 U.S.C. § 1512 – Tampering with a witness, victim, or informant (by misrepresenting Plaintiff's parenting conduct and behavior to law enforcement),
• 18 U.S.C. § 1961(1) – Predicate acts qualifying under RICO,
• 18 U.S.C. § 1962(c) – Participation in a racketeering enterprise through a pattern of unlawful conduct.

139. By exploiting the authority of police institutions to manufacture a legal narrative unsupported by fact, Defendants advanced the objectives of the enterprise: to damage Plaintiff's reputation, impair his parental rights, and coerce litigation advantage through systemic dishonesty.

140. **Predicate Act 4:** Tampering With Evidence to Support Fraudulent Legal Action

141. Between March 9 and March 26, 2025, Defendants 1 and 2 jointly participated in the intentional editing, concealment, and submission of a materially altered audio recording for use in legal proceedings. The original recording—captured by Defendant 1 during a domestic interaction—contained multiple exculpatory statements by Plaintiff, including declarations such as, "my mental and physical health are deteriorating," "the kids aren't uncomfortable," Defendant 1's victim posturing, and "let's gooo," directed peacefully toward the children. These statements were deliberately omitted from the version submitted to law enforcement and the court.

142. On March 15, 2025, Defendant 1 submitted the edited version to law enforcement in support of a temporary restraining order (TRO) application. On March 26, 2025, Defendant 2 submitted the same manipulated recording in a family court motion seeking Plaintiff's removal from the marital residence. At no point did either Defendant disclose the existence of the unaltered version or correct the omissions when notified via AppClose by Plaintiff. Their silence in the face of direct confrontation confirms knowledge and intent.

143. This conduct constitutes unlawful evidence tampering, obstruction of justice, and racketeering activity under:

- N.J.S.A. 2C:28-6 – Tampering with or fabricating physical evidence
- 18 U.S.C. § 1503 – Obstruction of justice (use of falsified material in judicial proceedings)
- 18 U.S.C. § 1343 – Wire fraud (if transmitted via electronic communication)
- 18 U.S.C. § 1961(1)(B) – Predicate racketeering acts under RICO

144. **Predicate Act 5:** Misappropriation and Weaponization of Private Communications to Advance Fraudulent Litigation

145. Defendants 1 through 5 jointly participated in the unauthorized acquisition, transmission, and misuse of Plaintiff's private communications, which were originally sent to family members under an expectation of confidentiality during active divorce proceedings. These communications included emotionally vulnerable disclosures, parental boundary assertions, and deeply personal reflections—none of which were intended for public or adversarial use.

146. Despite Plaintiff's explicit requests that family members remain neutral, Defendants 3, 4, and 5 knowingly transmitted Plaintiff's private messages to Defendant 1 and/or Defendant 2, with the understanding that the content would be used against him in litigation. These messages were then selectively excerpted and stripped of context by Defendant 2, and subsequently submitted to the court in a May 19, 2025 cross-motion reply, where they were used to malign Plaintiff's character and misrepresent his intentions.

147. This coordinated misuse of private materials inflicted reputational and emotional harm on Plaintiff and formed a critical component of the broader legal conspiracy designed to undermine his parental rights and personal credibility.

148. This conduct constitutes racketeering activity under:

- 18 U.S.C. § 1343 – Wire fraud (use of electronic communication to facilitate a fraudulent scheme)
- 18 U.S.C. § 371 – Conspiracy to commit offense or defraud the United States
- 18 U.S.C. § 1961(1)(B) – Predicate racketeering acts under RICO
- Potential state law violations – Including unauthorized disclosure of private communications, breach of confidence, or intrusion upon seclusion

149. **Predicate Act 6:** Coercive Interference with the Parent-Child Relationship to Advance a Litigation-Based Fraud

150. Since prior to and heaviest between March 9 and April 30, 2025, Defendants 1 and 2 executed a coordinated campaign of emotional and legal coercion to interfere with

Plaintiff's lawful and constitutionally protected relationship with his children, particularly his youngest daughter. This campaign included psychological manipulation, obstruction of access, and the strategic invocation of law enforcement to manufacture a narrative of unfitness and danger.

151. Historically, baby gates remained closed at the top of the stairs and between the dining room and kitchen throughout Plaintiff's daughters infancy and early toddler years, restricting her ability to independently access Plaintiff's living space. It was not until mid-March 2025—coinciding with the events at issue—that these gates were finally left open, whether through necessity or circumstance. Once unrestricted, she immediately began voluntarily seeking out Plaintiff. Her consistent and instinctive efforts to bond—without coaching—stand in stark contrast to Defendant 1's escalating efforts to control and suppress that relationship. Rather than respecting the child's emerging autonomy, Defendant 1 began intercepting her movements, removing her during moments of comfort, and weaponizing routine household interactions to regain control over the narrative and the children's access to Plaintiff.

152. Defendant 1's obstructive conduct included:

- Forcibly removing the youngest child from Plaintiff's arms during emotionally significant moments, including while she was asleep or visibly upset;

- Ignoring the child's repeated verbal expressions of comfort and preference for Plaintiff's presence;

- Unilaterally Imposing sudden and rigid household restrictions—such as mandatory bedtime routines, bathing requirements, and sleeping arrangements—never previously enforced, with no child-centered justification;

- Requiring the youngest child to sleep in Defendant 1's room nightly, and coercing their son to accompany her against his will.

- Weaponizing this control through a fabricated police report on April 16, 2025, alleging "neglect" when Defendant 1's older child was simply preparing food—marking a clear escalation from internal manipulation to misuse of state power.

153. Meanwhile, Plaintiff remained trapped in a legal chokehold. A fabricated Domestic Violence Summary Offense was still pending resolution, and Defendant 2 had filed a motion seeking Plaintiff's removal from the marital residence. At the same time, Defendant 1 was actively manufacturing a false narrative of fear, harassment, and intimidation—effectively chilling Plaintiff's ability to exercise his lawful parental rights or intervene to protect the children from escalating emotional distress.

154. This environment of fear and surveillance prevented Plaintiff from performing routine parental functions without risk of escalation or retaliatory legal consequences. Defendant 2 reinforced this campaign by submitting edited audio recordings and filings that deliberately mischaracterized Plaintiff's demeanor, manufacturing a false portrait of instability and danger.

155. These coordinated acts served the enterprise's goals to:

- Sever the natural bond between Plaintiff and his children;

- Undermine Plaintiff's parental authority;

- Isolate Plaintiff emotionally and physically;

- Generate custody leverage through a fraudulent litigation strategy.

156. This conduct constitutes racketeering activity under:

- 18 U.S.C. § 1343 – Wire fraud (use of electronic communications in furtherance of a fraudulent custody and legal campaign),
- 18 U.S.C. § 1951 – Interference with interstate commerce by threats or coercion (in civil RICO contexts involving coercive misuse of institutional power),
- 18 U.S.C. § 1961(1)(B) – Predicate acts for purposes of RICO liability,
- State law violations including custodial interference, abuse of process, and intentional infliction of emotional distress.

157. **Predicate Act 7:** Coercive Sexual Boundary Violation to Undermine Court-Ordered Limits and Manipulate Litigation Narrative

158. On or about July 26, 2025, Defendant 1 intentionally engaged in sexually suggestive conduct toward Plaintiff in direct contravention of a standing court order requiring all communications to occur exclusively through the AppClose platform. This incident occurred amid ongoing litigation in which Defendant 1 had repeatedly portrayed Plaintiff as abusive, dangerous, and emotionally destabilizing.

159. Specifically, Defendant 1 entered Plaintiff's private space wearing a robe with her chest exposed and verbally requested assistance with "fixing" her swimsuit. Plaintiff, visibly uncomfortable and silent throughout, briefly inspected the suit, found no defect, and returned it without comment. Defendant 1 then advanced physically toward him in a suggestive manner—mirroring a pattern of prior intimacy —despite the adversarial legal posture and clear communication boundaries in place. As Plaintiff reached for his phone to begin recording the encounter, Defendant 1 turned away. However, before ascending the stairs, she further stated, "I still need help tying it," reinforcing the sexually charged and inappropriate nature of the exchange.

160. This interaction:

- Violated a judicial directive restricting all communication to the AppClose platform;

- Contradicted Defendant 1's prior representations to law enforcement and the court, including sworn statements asserting fear, trauma, and discomfort in Plaintiff's presence;

- Introduced an unsolicited sexual overture likely intended to provoke Plaintiff into off-channel engagement that could later be manipulated or weaponized;

- Created a substantial reputational and legal risk for Plaintiff, who, under the threat of false or retaliatory allegations, was required to navigate the encounter without incident.

161. Plaintiff did not respond verbally and immediately recorded himself visibly and repeatedly shaking his head "no." He then documented the event on AppClose to establish contemporaneous notice, despite the encounter not being parenting-related.

162. This behavior exemplifies Defendant 1's pattern of manipulating narratives and violating protective court structures for litigation advantage. By inserting a sexually coercive dynamic into a contested legal environment, Defendant 1 advanced the enterprise's central objectives: destabilizing Plaintiff's legal credibility, eroding protective court orders, and introducing false indicia of reconciliation or consent.

163. This conduct constitutes racketeering activity under:

- 18 U.S.C. § 1503 – Obstruction of justice (by violating a court communication order and reintroducing off-channel engagement);
- 18 U.S.C. § 1343 – Wire fraud (if subsequent references to the encounter were transmitted electronically for use in filings or communications);
- 18 U.S.C. § 1951 – Extortion or coercion via abuse of process in the civil context;
- 18 U.S.C. § 1961(1)(B) – Racketeering predicate acts under RICO;
- N.J.S.A. 2C:33-4 – Harassment (as conduct intended to alarm, seriously annoy, or violate a protective legal boundary).

164. **Predicate Act 8:** Fraud on the Court Through Knowingly False Filings and Material Misrepresentation

165. On March 26, 2025, Defendant 2, acting as legal counsel for Defendant 1, submitted a motion in New Jersey Superior Court seeking Plaintiff's removal from the marital home, the striking of his pleadings, parenting restraints, and expansive legal and financial control. This was not zealous advocacy—it was a calculated fraud on the court, rooted in knowingly false statements, omission of material facts, and deliberate mischaracterization of the parties' relationship and conduct.

166. The motion included, among other falsehoods:

- A claim that Defendant 1 was subjected to coercive control and financially dependent, despite her years-long refusal to seek employment or obtain a driver's license—facts documented through Plaintiff's prior messages and repeated requests for self-sufficiency.

- A fabricated allegation that Plaintiff "forced" the eldest child to sleep in the basement "so he knows where he is at all times"—a defamatory and factually unsupported claim, contradicted by the child's consistent voluntary presence with Plaintiff and their documented emotional bond.

- An accusation of harassment, supported solely by an audio recording deliberately stripped of exculpatory context.

167. The associated Domestic Violence Summary Offense was later dismissed, and the police investigation found no evidence of criminal conduct.

168. On May 19, 2025, Defendant 2 compounded this misconduct by submitting a cross-motion reply that:

- Repeated knowingly false claims of instability and retaliation;

- Mischaracterized parenting incidents without corroboration;

- Weaponized private family communications obtained from Defendants 3, 4, and 5 —despite their familial relationship with Plaintiff and the implicit expectation of privacy surrounding such communications—were shared with Defendants 1 and 2 for litigation purposes;

- Recommended that Plaintiff reside with Defendants 4 and 6 while simultaneously citing hostile communications provided by Defendant 4 to question Plaintiff's credibility—a logically inconsistent position evidencing strategic dishonesty.

169. These representations were not good-faith legal arguments. They were affirmatively false statements submitted by an officer of the court with intent to mislead the tribunal and obtain unjust legal relief.

170. This conduct constitutes racketeering activity under:

- 18 U.S.C. § 1341 / § 1343 – Mail and wire fraud (if filings or exhibits were transmitted electronically);
- 18 U.S.C. § 1503 – Obstruction of justice;
- 18 U.S.C. § 1961(1)(B) – Predicate acts under RICO;
- New Jersey RPC 3.3 – False statements of fact and failure to correct known falsehoods;
- N.J. Ct. R. 1:4-8 – Sanctions for frivolous or bad-faith pleadings.

171. By deliberately misleading the court to secure life-altering relief—including home eviction, reputational damage, and parental restrictions—Defendant 2 advanced the racketeering enterprise's central objective: legal domination through fraud, procedural coercion, and reputational sabotage.

## VIII. COUNTS

I.   COUNT I – Civil RICO (18 U.S.C. § 1962(c))

(Against All Defendants)

(A) Statutory Framework

172. Plaintiff brings this action under 18 U.S.C. § 1964(c) for violations of 18 U.S.C. § 1962(c), which prohibits any person employed by or associated with an enterprise engaged in, or whose activities affect, interstate commerce, from conducting or participating in the enterprise's affairs through a pattern of racketeering activit

_____

(B) The Enterprise (18 U.S.C. § 1961(4))

173. Defendants 1 through 7 constituted an association-in-fact enterprise (the "Enterprise") formed for the common purpose of:

- Gaining unfair advantage in an active family law proceeding;

- Inflicting reputational, financial, and emotional harm on Plaintiff;

- Depriving Plaintiff of parental rights, residential stability, and professional standing;

- Protecting each other from exposure, discovery, and legal accountability; and

- Advancing Defendant 1's litigation goals and Defendant 2's professional standing through coordinated deceit.

174. The Enterprise functioned continuously through coordinated misconduct, including falsification of evidence, strategic misuse of court filings, manipulation of law enforcement, and exploitation of digital communication to advance a fraudulent legal narrative.

_____

(C) Pattern of Racketeering Activity (18 U.S.C. § 1961(1), (5))

175. Defendants engaged in a pattern of racketeering activity, consisting of at least eight interrelated predicate acts occurring within a 10-year span, including but not limited to:

176. Submission of manipulated audio evidence to the police and court (Obstruction of Justice, 18 U.S.C. § 1503; Wire Fraud, § 1343);

- Conspiracy to fabricate judicial evidence (Conspiracy to Obstruct Justice, § 1512(k));

- Filing of false police reports and instigating retaliatory law enforcement action (Fraud, Abuse of Process);

- Tampering with digital evidence to conceal exculpatory material (18 U.S.C. § 1519; N.J.S.A. 2C:28-6);

- Misappropriation and weaponization of private communications (Wire Fraud, § 1343; Invasion of Privacy);

- Coercive interference with the parent-child relationship, including emotional conditioning and obstruction of bonding;

- Sexual boundary violation during litigation to provoke, confuse, or manipulate legal posture;

- Fraud on the court via knowingly false legal filings (Mail/Wire Fraud, §§ 1341, 1343; Obstruction of Justice, § 1503; RPC 3.3).

177. Each predicate act was independently unlawful and collectively formed a pattern under 18 U.S.C. § 1961(5).

_____

(D)  Operation and Management of the Enterprise

178. Each Defendant knowingly participated in the conduct of the Enterprise's affairs by:

- Coordinating the submission of false, misleading, or manipulated evidence;

- Orchestrating legal filings built on factual omissions and distortions;

- Leveraging law enforcement for retaliatory purposes;

- Engaging in witness tampering and dissemination of private communications;

- Undermining Plaintiff's access to his children and to a fair legal process.

179. Defendant 2, a licensed attorney, served as a principal operator of the Enterprise by drafting and submitting false pleadings and directing litigation strategy. Under Reves v. Ernst & Young, 507 U.S. 170 (1993), her conduct meets the threshold for management of the enterprise.

———

(E)  Effect on Interstate Commerce

180. The Enterprise's conduct substantially affected interstate commerce by:

- Triggering law enforcement and judicial proceedings involving federally funded and state resources;

- Transmitting filings electronically across state lines;

- Endangering Plaintiff's federal employment and security clearance tied to interstate and international projects;

- Requiring Plaintiff to incur legal costs, retain out-of-state counsel, and prepare for litigation beyond state boundaries.

———

(F)  Injury to Plaintiff

181. As a direct and proximate result of Defendants' racketeering conduct, Plaintiff suffered:

- Financial injury, including attorney fees, lost income, and forfeited vacation time;

- Emotional and reputational injury, including humiliation, fear, and coerced silence under false allegations;

- Parental deprivation, including reduced access, emotional disconnection, and interference with the parent-child bond;

- Professional harm, including exposure to security clearance review processes and potential loss of career opportunities;

- Residential instability, including an attempted unlawful removal from the marital home.

———

(G) Relief Requested (18 U.S.C. § 1964(c))

182. Plaintiff seeks the following remedies:

- Treble damages for all financial, reputational, and emotional injuries;

- Costs of suit and reasonable attorney's fees;

- Declaratory relief acknowledging the fraudulent and retaliatory nature of Defendants' conduct;

- Injunctive relief barring further abuse of process, parental interference, or coordinated retaliatory filings;

- Any additional relief the Court deems just and proper.COUNT II: Violation of 18 U.S.C. § 1962(d) (Civil RICO - Conspiracy)

(II) COUNT II – Civil RICO Conspiracy (18 U.S.C. § 1962(d))

(Against All Defendants)

(A) Statutory Framework

183. Plaintiff brings this cause of action under 18 U.S.C. § 1964(c) for violations of 18 U.S.C. § 1962(d), which prohibits any person from conspiring to violate the provisions of 18 U.S.C. § 1962(c). A defendant may be held liable under § 1962(d) even if they did not personally commit any predicate act, so long as they knowingly agreed to facilitate the racketeering conduct of the enterprise.

———

(B) The Conspiracy

184. Defendants 1 through 7 knowingly and willfully conspired to conduct and participate, directly or indirectly, in the affairs of the Enterprise described in Count I, through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(1) and (5).

185. The Defendants shared a common purpose:

- To gain advantage in pending legal proceedings through deceit and manufactured evidence;

- To harm Plaintiff emotionally, financially, and professionally;

- To obstruct justice and undermine fair adjudication;

- To shield one another from accountability and manipulate the judicial process for personal and professional gain.

———

(C) Overt Acts in Furtherance of the Conspiracy

186. In furtherance of the conspiracy, one or more Defendants committed overt acts, including but not limited to:

- Falsification and strategic omission of audio evidence, submitted to law enforcement to provoke criminal investigation and a domestic violence charge;

- False police reports and retaliatory 9-1-1 calls, designed to create a fabricated record of fear and control;

- Misuse of private family communications, improperly obtained and weaponized to attack Plaintiff's credibility in court;

- Filing of knowingly false court documents, including sworn certifications and motions designed to remove Plaintiff from the marital home, strike his pleadings, and interfere with his parental rights;

- Sexual manipulation during litigation, used as a means to provoke, confuse, and entrap Plaintiff into compromising conduct or reaction;

- Concealment of exculpatory evidence, including unedited recordings and contradictory witness knowledge;

- Coercion of child testimony and manipulation of family dynamics, used to support a false narrative of household control and intimidation.

187. Each of these acts furthered the enterprise's unlawful objectives and constitutes overt conduct in furtherance of the § 1962(d) conspiracy.

———

(D) Knowledge and Agreement

188. Each Defendant:

- Knew of the existence and goals of the Enterprise;

- Knew that other participants were committing racketeering acts to achieve those goals;

- Willingly agreed—explicitly or tacitly—to participate in the scheme by facilitating, covering up, or building upon the unlawful conduct of others.

———

(E)  Injury to Plaintiff

189. As a direct and foreseeable consequence of Defendants' conspiracy, Plaintiff suffered:

- Financial injury, including significant legal expenses and lost income;

- Emotional and reputational injury, including humiliation, fear, and damage to standing in the community;

- Loss of parental rights and time, including blocked bonding, damaged emotional connections with his children, and harmful imposition of false custody restraints;

- Professional injury, including risk to his high-level federal security clearance;

- Residential interference, including attempts to forcibly remove him from his home based on knowingly false filings.

_____

(F)  Relief Requested (18 U.S.C. § 1964(c))

190. Plaintiff respectfully seeks:

- Treble damages for all injuries sustained as a result of the conspiracy;

- Reasonable attorneys' fees and the costs of suit;

- Declaratory relief establishing that a RICO conspiracy existed and injured Plaintiff;

- Injunctive relief barring any future racketeering conduct or conspiracy;

- Such other relief as the Court deems just and appropriate.

(III) COUNT III – Common Law Fraud

(Against Defendants 1 and 2)

(A)  Legal Framework

191. Under New Jersey common law, fraud requires proof of: (1) a false representation of material fact; (2) knowledge of its falsity by the party making the representation; (3) intent that the other party rely on the false statement; (4) reasonable reliance by the victim; and (5) resulting damages.

192. Defendants 1 and 2 knowingly engaged in a pattern of fraudulent misrepresentations and omissions during the course of family court litigation, designed to deceive the tribunal, gain improper legal advantage, and inflict reputational and financial harm on Plaintiff.

_____

(B)  Material Misrepresentations and Omissions

193. Defendants 1 and 2 jointly submitted sworn statements and court filings that:

- Falsely accused Plaintiff of domestic abuse, coercive control, and harassment;

- Mischaracterized household events and parental behavior to construct a false fear narrative;

- Omitted key exculpatory details, including Plaintiff's repeated documented pleas for cooperation and de-escalation;

- Presented manipulated evidence, including an audio recording with deliberate omissions of context, and strategically timed third-party communications from Defendants 3, 4, and 5 to reinforce the false narrative.

194. These statements were made in verified pleadings and in open court with the intent that the court rely on them in issuing injunctive relief, parenting restraints, and financial orders against Plaintiff.

———

(C)  Intent and Knowledge

195. Defendants 1 and 2 knew or should have known that their representations were materially false, and that their omissions would significantly mislead the Court.

196. Their fraudulent conduct was not accidental or negligent—it was strategic, deliberate, and intended to induce unjust legal consequences.

———

(D)  Reasonable Reliance and Harm

197. The New Jersey Superior Court, relying on these representations:

- Ordered Plaintiff to respond to false claims under duress;

- Issued parenting restrictions and entertained removal from the marital home;

- Considered unverified claims and manipulated recordings in determining Plaintiff's legal exposure.

198. Plaintiff reasonably relied on the expectation that opposing counsel would comply with their duty of candor and truthfulness under court rules. As a result of Defendants' fraud, Plaintiff suffered substantial and foreseeable harm.

———

(E)  Injury to Plaintiff

199. Plaintiff sustained injuries including but not limited to:

- Reputational harm and humiliation in court;

- Emotional distress, including anxiety, isolation, and fear of losing his children;

- Significant legal fees to defend against the fraudulently obtained relief;

- Risk to Plaintiff's federal security clearance due to false claims of domestic violence;

- Interference with parent-child bonding and custodial rights;

- Loss of peaceful residence in the marital home.

———

(F)  Relief Requested

200.Plaintiff respectfully seeks:

- Compensatory damages for all injuries suffered;

- Punitive damages due to the willful and malicious nature of Defendants' conduct;

- Attorneys' fees and costs of suit;

- Any further relief the Court deems just and equitable.

(IV) COUNT IV – Abuse of Process

(Against Defendants 1 and 2)

(A)  Legal Framework

201.Abuse of process under New Jersey law occurs when a party intentionally misuses legal procedures after they have been initiated, for an improper, ulterior purpose not intended by law. It does not require that the process itself be unlawful—only that it be used to achieve an end other than that which it was designed to accomplis

———

(B)  Improper Use of Legal Process

202.Defendants 1 and 2 initiated and weaponized various legal mechanisms, including:

- A temporary restraining order (TRO) based on manipulated and incomplete audio recordings;

- Multiple police reports and calls under false or exaggerated pretenses;

- Custody-related motions and filings that relied on provably false claims and concealed material facts.

203. These instruments of law were used not for their proper purpose—to ensure safety or resolve legal disputes fairly—but to:

- Intimidate Plaintiff and paint him as a danger;

- Leverage legal consequences to gain strategic advantage in the underlying custody and divorce litigation;

- Impair Plaintiff's access to his children, reputation, and housing stability.

———

(C)  Ulterior Purpose and Bad Faith

204. The acts taken by Defendants were not legitimate efforts to protect the children or seek relief in good faith. Instead, they were part of a broader pattern of:

- Retaliation against Plaintiff for asserting custodial rights;

- Public shaming and reputational destruction;

- Emotional coercion and destabilization of Plaintiff's life and parental role.

205. This abuse of legal channels was intentional, strategic, and continuous—designed to achieve improper objectives through legitimate process.

———

(D)  Injury to Plaintiff

206. As a direct and foreseeable result of Defendants' abuse of process, Plaintiff suffered:

- Emotional distress, including humiliation, fear, and psychological harm;

- Significant legal fees and resource expenditure to defend against false claims;

- Damage to parental rights, including loss of bonding time and restrictions based on manipulated filings;

- Reputational harm within the court system and broader community;

- Threats to his federal employment and security clearance due to pending criminal and civil allegations rooted in falsehoods.

———

(E)  Relief Requested

207. Plaintiff respectfully seeks:

- Compensatory damages for all economic and non-economic injuries suffered;

- Punitive damages to deter future misuse of legal process;

- Attorneys' fees and costs of suit;

- Any such further relief the Court deems just and proper.

(V)  COUNT V – Intentional Infliction of Emotional Distress

(Against Defendants 1 and 2)

(A)  Legal Framework

208. Under New Jersey law, a claim for intentional infliction of emotional distress ("IIED") requires:

- Extreme and outrageous conduct;

- Intent to cause emotional distress, or reckless disregard of the probability of causing such distress;

- A causal connection between the conduct and the emotional distress; and

- Severe emotional distress suffered by the plaintiff.

———

(B)  Extreme and Outrageous Conduct

209. Defendants 1 and 2 engaged in a course of conduct so extreme in degree and outrageous in character as to go beyond all bounds of decency, including:

- Submitting manipulated and incomplete audio evidence to law enforcement and the court with intent to provoke criminal charges;

- Repeatedly filing false police reports and civil claims alleging fear, harassment, and control;

- Engaging in sexual boundary violations and provocative conduct during active litigation, with intent to destabilize or entrap Plaintiff;

- Withholding exculpatory evidence while pursuing criminal and custody-related consequences;

- Coordinating false narratives to interfere with Plaintiff's parental role and reputation.

———

(C)  Intent or Recklessness

210. These actions were carried out intentionally, or at minimum with reckless disregard for the foreseeable emotional harm they would cause. Defendants 1 and 2 were fully

aware of Plaintiff's emotional vulnerability, the sensitive nature of family litigation, and the stakes related to custody, reputation, and career.

211. Rather than act in good faith, they exploited these vulnerabilities to discredit, punish, and destabilize Plaintiff emotionally and psychologically.

—————

(D) Resulting Emotional Harm

212. As a direct result of this outrageous and malicious conduct, Plaintiff suffered profound emotional consequences. Plaintiff cannot conceive of a more heinous emotional injury than the deliberate and unjustified separation of a child from the parent they love most—and the forced isolation of a parent from the only family they have left. The emotional toll of such cruelty cannot be overstated.

(E) Plaintiff suffered:

- Severe emotional distress, including prolonged anxiety, fear, humiliation, and psychological anguish;

- Sleep disruption, depression, and physical exhaustion;

- Ongoing distress related to interference with the father-child bond and forced separation;

- Emotional deterioration resulting from reputational harm, loss of community trust, and chronic fear of legal retaliation.

—————

(F) Relief Requested

213. Plaintiff respectfully seeks:

- Compensatory damages for emotional and physical harm sustained;

- Punitive damages due to the willful and malicious nature of Defendants' conduct;

- Attorneys' fees and costs of litigation;

- Any other relief the Court deems just and proper.

(VI) COUNT VI – Invasion of Privacy (Public Disclosure & False Light)

(Against All Defendants)

—————

(A) Legal Framework

214. Under New Jersey law, a plaintiff may recover for Invasion of Privacy under two closely related theories:

- Public Disclosure of Private Facts, which occurs when private information is publicly disclosed without consent in a manner that would be highly offensive to a reasonable person and is not of legitimate public concern; and

- False Light, which occurs when a defendant publicly attributes to the plaintiff views or actions they did not take, or otherwise portrays them in a misleading and damaging manner.

215. These torts are actionable even if the underlying statements are factually accurate, so long as they were presented in a selectively distorted or unnecessary manner with the intent to cause reputational harm.

——

(B) Defendants' Conduct

216. All named Defendants accessed or retained private communications shared by Plaintiff in confidence—including personal text messages and private emotional expressions. Rather than handle these communications in good faith, Defendants:

- Selected, edited, or quoted messages out of context;

- Presented private emotional statements as evidence of instability, abuse, or dangerous behavior;

- Shared these communications with third parties not directly involved in any legal proceeding, including members of Plaintiff's family and extended social circle.

217. This disclosure was not necessary for any legal purpose and served solely to distort Plaintiff's character, create stigma, and manipulate perceptions of his emotional health and parental fitness.

——

(C) Public Misrepresentation and False Light

218. Defendants intentionally framed Plaintiff's private messages in a false light, including:

- Asserting that Plaintiff was emotionally unstable or controlling, based solely on distorted readings of personal or emotionally vulnerable communications;

- Using family members' manipulated reactions as supposed "confirmation" of Plaintiff's alleged unfitness;

- Creating an artificially damaging narrative through implication and omission, rather than through direct and fair representation of facts.

219. This portrayal was not only false, but calculated to inflict maximum reputational damage and to support false narratives in pending legal actions.

——

(D)  Resulting Harm

220. As a direct result of these disclosures and distortions, Plaintiff suffered:

- Reputational injury within his extended family and social network;

- Emotional harm stemming from betrayal, humiliation, and public judgment;

- Further erosion of his parental relationship due to stigmatization and perceived instability;

- A lasting sense of personal violation, as his most private expressions were used to harm him.

——

(E)  Relief Requested

221. Plaintiff respectfully seeks:

- Compensatory damages for reputational and emotional harm;

- General damages for humiliation, loss of privacy, and damage to personal and familial reputation;

- Attorneys' fees and litigation costs;

- Such other relief as the Court deems just and proper.

(VII) COUNT VII – Defamation

(Against Defendants 1 and 2)

(A)  Legal Framework

1.   Under New Jersey law, a defamation claim requires:

- A false and defamatory statement concerning the plaintiff;

- Communication of that statement to a third party without privilege;

- Fault amounting to at least negligence; and

- Actual or presumed damages.

222. Where the plaintiff is a public official or matter of public concern is involved, actual malice must be shown.

——

(B) Defamatory Statements

223. Defendants 1 and 2 knowingly published and disseminated false statements about Plaintiff, including but not limited to:

- Allegations of abuse, coercion, and control;

- Assertions that Plaintiff posed a danger to others or to his own children;

- Claims of emotional instability and harassment.

224. These statements were made:

- In sworn court filings and motions;

- Through oral representations in the presence of third parties, including law enforcement and court officers;

- With the intent that they be adopted or relied upon in legal and administrative proceedings.

———

(C) Falsity and Malice

1. These statements were:

- Factually false and unsupported by any objective evidence;

- Made with knowledge of their falsity or with reckless disregard for the truth;

- Part of a broader strategy to manipulate custody proceedings and discredit Plaintiff's character.

———

(D) Harm to Plaintiff

225. As a direct and proximate result of these defamatory statements, Plaintiff suffered:

- Reputational injury, including diminished standing in professional, personal, and legal circles;

- Emotional distress and public humiliation;

- Damage to personal and professional relationships;

- Harm to career stability and risk to high-level federal security clearance.

———

(E) Relief Requested

226. Plaintiff respectfully seeks:

- Compensatory damages for reputational and emotional harm;

- Punitive damages due to the malicious nature of the statements;

- Attorneys' fees and costs;

- Such other relief as the Court deems just and appropriate.

(VIII) COUNT VIII – Civil Conspiracy

(State Common Law)

(Against All Defendants)

(A)  Legal Framework

227. Under New Jersey common law, a civil conspiracy occurs when:

- Two or more persons agree to commit an unlawful act or a lawful act by unlawful means;

- There is a meeting of the minds;

- One or more overt acts are performed in furtherance of the conspiracy;

- The plaintiff suffers damages as a proximate result.

_____

(B)  Conspiratorial Agreement

228. Defendants 1 through 7 knowingly and willfully entered into an agreement—express or tacit—to engage in unlawful and harmful conduct against Plaintiff. The objectives of the conspiracy included:

- Gaining leverage in custody and divorce proceedings through false narratives;

- Causing reputational, emotional, and professional harm;

- Obstructing justice and depriving Plaintiff of parental rights;

- Shielding one another from scrutiny and accountability.

_____

(C)  Overt Acts in Furtherance

229. To advance the goals of the conspiracy, one or more Defendants committed overt acts, including:

- Fabrication and submission of altered audio recordings to law enforcement;

- Filing of knowingly false court certifications and motions;

- Repeatedly contacting police with false or exaggerated claims;

- Disseminating private communications without consent;

- Coordinating legal filings designed to mislead the court;

- Sexual coercion and manipulation intended to entrap Plaintiff;

- Enlisting third parties to spy on or interfere with Plaintiff's parental role.

230. Each act furthered the conspiracy's unlawful aims.

―――

(D)  Injury to Plaintiff

231. As a direct and proximate result of the conspiracy, Plaintiff suffered:

- Legal and financial harm, including litigation costs and lost time;

- Reputational damage and public discrediting;

- Emotional distress, humiliation, and fear;

- Loss of access to and emotional connection with his children;

- Professional risk to his federal employment and security clearance.

―――

(E)  Relief Requested

232. Plaintiff respectfully seeks:

- Compensatory and consequential damages for all injuries sustained;

- Punitive damages for Defendants' willful and malicious conduct;

- Attorneys' fees and costs;

- Such other relief as the Court deems just and equitable.

(IX) COUNT IX – Tortious Interference with Parental Rights

(Against Defendants 1 and 2)

(A)  Legal Framework

233. Under New Jersey common law, a claim for tortious interference with parental rights arises when a party intentionally interferes with the custodial or visitation rights of a parent, absent lawful justification, and causes injury to the parent-child relationship.

_____

(B) Wrongful Conduct by Defendants

234. Defendants 1 and 2 knowingly and willfully engaged in conduct intended to interfere with Plaintiff's parental relationship, including:

- Manipulating physical custody arrangements without consent or legal basis;

- Restricting the children's voluntary access to Plaintiff;

- Presenting false and defamatory statements to law enforcement and the court to justify parenting restrictions;

- Utilizing coercive tactics, such as false allegations and manufactured fear narratives, to deprive Plaintiff of time and emotional connection with his children.

235. This interference was not legally justified and was intended to secure litigation advantage rather than protect the children's welfare.

_____

(C) Harm to Plaintiff and the Children

236. As a direct result of Defendants' actions, Plaintiff suffered:

- Emotional harm from being unjustly separated from his children;

- Damage to the parent-child bond, including suppressed affection and reduced trust;

- Loss of parenting time and diminished parental authority;

- Distress over the emotional harm inflicted on the children through manipulation and separation.

_____

(D) Relief Requested

237. Plaintiff respectfully requests:

- Compensatory damages for emotional and relational harm;

- Injunctive relief preventing further interference with his custodial and parental rights;

- Attorneys' fees and costs;

• Any further relief the Court deems just and proper.

(X)  COUNT X – Fraud on the Court (Inherent Power Doctrine)

(Against Defendant 2)

(A)  Legal Framework

238. Federal and state courts possess inherent authority to set aside judgments and provide remedies where a party has perpetrated "fraud on the court"—a grave abuse involving conduct that subverts the integrity of the judicial process itself. Fraud on the court includes intentional misrepresentations, concealment of material facts, or conduct by officers of the court that corrupts the adversarial process.

——

(B)  Misconduct by Defendant 2

239. Defendant 2, acting as legal counsel and an officer of the court, knowingly and repeatedly:

• Submitted motions and certifications containing materially false factual assertions, including claims of abuse, coercion, and emotional instability unsupported by evidence or adjudicated finding;

• Deliberately omitted critical exculpatory context from audio recordings, including Plaintiff's statements evidencing calm demeanor, emotional exhaustion, and lack of threat;

• Reinforced these misrepresentations in subsequent filings to obtain unjust relief, including attempts to remove Plaintiff from the marital home and restrict his parental rights.

240. This was not zealous advocacy—it was a knowing manipulation of the judicial process to achieve improper objectives through deceit.

——

(C)  Impact on Judicial Integrity

241. The misconduct detailed above undermined the fairness and impartiality of the court, corrupted the truth-finding function of litigation, and threatened public confidence in the judicial system. It constitutes fraud on the court under the doctrine recognized by the U.S. Supreme Court in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944), and under New Jersey law.

——

(D)  Relief Requested

242. Plaintiff respectfully requests:

- That the Court find Defendant 2 engaged in fraud on the court;

- That any relief obtained through falsehood or omission be vacated or reconsidered;

- That the Court impose sanctions or other disciplinary action consistent with its inherent authority;

- That Plaintiff be awarded attorneys' fees, costs, and any further relief the Court deems just and proper.

(XI) COUNT XI – Aiding and Abetting (All Underlying Torts)

(Against Defendants 3 through 9)

(A)  Legal Framework

243. Under civil aiding and abetting doctrine, a defendant may be held liable for the tortious acts of another where the defendant:

    (1)  had knowledge of the wrongful conduct;

    (2)  provided substantial assistance or encouragement; and

    (3)  acted with the intent of facilitating the commission of the tort.

244. This doctrine applies across a wide range of torts, including fraud, invasion of privacy, emotional distress, and interference with parental rights.

_____

(B)  Conduct of Defendants 3 through 9

245. To the extent any Defendant did not directly perpetrate the wrongful conduct described in this Complaint, each nevertheless:

- Aided, abetted, or encouraged the conduct of others;

- Provided confidential or emotionally sensitive communications to support the narrative against Plaintiff;

- Assisted in fabricating or reinforcing false representations submitted to the court;

- Participated in coordinated narrative building designed to injure Plaintiff legally, emotionally, and reputationally;

- Contributed to the ongoing racketeering enterprise by enabling, concealing, or amplifying the harms.

_____

(C)  Knowledge and Substantial Assistance

246. Each Defendant knew or should have known the impact of their participation in the scheme and materially advanced the tortious conduct, whether through direct communication with Defendant 1 or 2, selective information disclosure, or silent complicity in acts intended to defame, isolate, or emotionally destabilize Plaintiff.

——

(D)  Injury to Plaintiff

247. As a direct and proximate result of the collective and individual conduct of Defendants 3 through 9, Plaintiff suffered:

- Emotional harm and reputational injury;

- Legal and financial harm from the litigation misconduct enabled by Defendants' support;

- Parental deprivation and interference with his relationship with his children;

- Professional and personal consequences stemming from coordinated defamation and falsehoods.

——

(E)  Relief Requested

248. Plaintiff respectfully seeks:

- Compensatory damages for all injuries sustained;

- Joint and several liability against all parties who aided or abetted the enterprise or any underlying tort;

- Attorneys' fees and costs;

- Any further relief the Court deems just and equitable.

(XII) COUNT XII – Tortious Interference with Prospective Economic Advantage

(Against Defendants 1 and 2)

(A)  Legal Framework

249. Under New Jersey law, a claim for tortious interference with prospective economic advantage requires:

    (1)  A reasonable expectation of economic benefit or advantage;

    (2)  Interference done intentionally and without justification;

(3) A reasonable probability that the interference caused the loss of the prospective gain; and

(4) Resulting damages.

____

(B) Plaintiff's Reasonable Expectation of Economic Benefit

250. Plaintiff, as a federal employee holding a high-levelt security clearance, possessed:

- A longstanding professional record with stable earnings;

- Prospects for advancement and continued retention in sensitive government positions;

- Economic and reputational capital based on credibility, integrity, and perceived stability.

____

(C) Deliberate Interference by Defendants

251. Defendants 1 and 2 intentionally and unjustifiably interfered with Plaintiff's economic future by:

- Submitting knowingly false claims of harassment, abuse, and control in legal filings;

- Initiating a Domestic Violence Summary Offense that could have triggered clearance review or suspension;

- Publicizing defamatory material to damage Plaintiff's trustworthiness and professional reputation;

- Framing Plaintiff as a threat to household members in ways that created mandatory reporting or administrative risk.

252. These actions were not incidental to a legal dispute—they were strategic maneuvers designed to economically destabilize Plaintiff by endangering his employment.

____

(D) Causation and Resulting Injury

253. As a direct and foreseeable result of Defendants' actions, Plaintiff suffered:

- Risk to his federal employment and clearance status;

- Reputational harm that threatened future earnings and advancement;

- Emotional distress and disruption to professional focus;

- Increased legal expenses required to defend against reputationally damaging claims.

_____

(E)  Relief Requested

254. Plaintiff respectfully seeks:

- Compensatory damages for economic harm and reputational injury;

- Punitive damages for malicious and unjustified interference;

- Attorneys' fees and costs;

- Such other relief as the Court deems just and proper.

(XIII) COUNT XIII – Malicious Prosecution

(Against Defendants 1 and 2)

(A)  Legal Framework

255. Under New Jersey law, a claim for malicious prosecution requires:

(1)  The initiation of a criminal proceeding by the defendant;

(2)  Without probable cause;

(3)  With malice;

(4)  That was terminated in favor of the plaintiff; and

(5)  Resulted in damages.

_____

(B)  Initiation of Baseless Criminal Charges

256. On or about March 16, 2025, Defendant 1—acting in coordination with Defendant 2—initiated a false and retaliatory police complaint that resulted in Plaintiff being charged with a Domestic Violence summary offense (harassment).

257. This charge was based on:

- A selectively edited audio recording, stripped of exculpatory content;

- A narrative constructed in direct contradiction to the full context of the recorded event;

- Legal coaching by Defendant 2, who advised Defendant 1 in real time on how to weaponize the interaction.

———

(C)  Lack of Probable Cause and Malicious Intent

258. The audio recording and accompanying statements failed to establish any conduct rising to the level of criminal harassment.

- The underlying police investigation concluded without finding any threat, assault, or criminal behavior;

- The charge was ultimately dismissed, demonstrating the absence of probable cause;

- The complaint was filed as part of a broader scheme to gain litigation leverage in family court—not for protection or public safety.

259. Defendants knew the allegations were false or grossly exaggerated, and proceeded with malice and intent to harm Plaintiff personally and strategically.

———

(D)  Termination in Plaintiff's Favor

260. The criminal complaint against Plaintiff was dismissed without conviction or plea, satisfying the requirement of a favorable termination.

———

(E)  Resulting Injury

261. As a direct result of Defendants' malicious prosecution, Plaintiff suffered:

- Reputational harm, including damage to his character, community standing, and perception of moral fitness;

- Emotional trauma, including stress, fear of arrest, and public humiliation;

- Risk to his federal high-level Secret security clearance, professional standing, and future employment;

- Legal fees and time lost in mounting a defense against baseless charges.

———

(F)  Relief Requested

262. Plaintiff respectfully seeks:

- Compensatory damages for emotional, reputational, and financial harm;

- Punitive damages for malicious abuse of the criminal process;

- Attorneys' fees and costs;

- Such other relief as the Court deems just and proper.

(XIV) COUNT XIV – Negligent Infliction of Emotional Distress (NIED)

(Against All Defendants)

(A)  Legal Framework

263. Under New Jersey law, a plaintiff may recover for Negligent Infliction of Emotional Distress where:

    (1)  The defendant owed a duty of care to the plaintiff;

    (2)  The defendant breached that duty through negligent or reckless conduct;

    (3)  The plaintiff suffered severe emotional distress as a proximate result; and

    (4)  The distress was foreseeable under the circumstances.

——

(B)  Defendants' Breach of Duty

264. All named Defendants owed Plaintiff a duty to refrain from engaging in knowingly harmful or grossly negligent conduct, especially in matters involving:

- Use of the legal system to pursue baseless allegations;

- False portrayals of abuse and instability in family and criminal court filings;

- Manipulation of children and weaponization of custody proceedings;

- Fabrication or distortion of evidence submitted to law enforcement and judicial officers.

265. These duties are heightened where foreseeable harm includes damage to the parent-child bond, professional licensure, and emotional stability.

——

(C)  Negligent and Reckless Conduct

266. Defendants breached their duty by:

- Disseminating defamatory statements about Plaintiff to law enforcement, courts, and third parties;

- Filing knowingly false police reports and restraining order requests;

- Submitting edited audio designed to provoke false criminal charges;

- Engineering parental alienation and disruption of Plaintiff's relationship with his children.

267. This conduct was unreasonable, reckless, and foreseeably harmful, particularly given Plaintiff's role as the children's primary emotional caregiver and a federal clearance holder.

——

(D)  Resulting Emotional Harm

268. As a direct and foreseeable result of Defendants' negligent conduct, Plaintiff suffered:

- Severe emotional distress, including anxiety, depression, and sleep disruption;

- Reputational harm within both personal and professional communities;

- Damage to his relationship with his children, including blocked bonding and emotional erosion;

- A destabilizing loss of personal safety, predictability, and dignity.

——

(E)  Relief Requested

269. Plaintiff respectfully seeks:

- Compensatory damages for emotional and reputational harm;

- Recovery for mental anguish, relational injury, and impaired professional capacity;

- Attorneys' fees and litigation costs;

- Such other relief as the Court deems just and proper.

(XV) COUNT XV – Misuse of Legal Authority Under Color of Advocacy

(Against Defendant 2)

——

(A)  Legal Framework

270. While attorneys are afforded broad discretion in representing their clients, that discretion does not extend to acts of fraud, fabrication, or misuse of legal process. An attorney who abuses their professional position to:

- Participate in or facilitate unlawful conduct;

- Submit or direct the submission of falsified evidence; or

- Leverage their status to intimidate, manipulate, or defraud—

271. is not shielded by privilege and may be held civilly liable under common law torts and principles of legal ethics.

——

(B) Breach of Ethical and Legal Boundaries

272. Defendant 2 acted not merely as legal counsel, but as a strategic architect of the wrongful acts outlined herein. Her conduct included:

- Coaching Defendant 1 on how to provoke or record interactions for litigation advantage;

- Drafting or directing false or misleading statements to be submitted in legal certifications;

- Facilitating the submission of edited or manipulated audio recordings to police and court;

- Repeating knowingly false claims of control, fear, or instability in sworn filings and correspondence;

- Using her status as an attorney to intimidate Plaintiff through threats of criminal escalation if civil demands were not met.

273. These actions exceeded the bounds of zealous advocacy and represent a gross misuse of legal authority.

——

(C) Foreseeable Harm to Plaintiff

274. Defendant 2's misconduct foreseeably resulted in:

- Damage to Plaintiff's reputation, including the appearance of criminality, abuse, or instability;

- Emotional trauma and psychological distress stemming from manufactured criminal risk;

- Diminished access to his children due to manipulated legal narratives;

- Exposure to false charges, reputational collapse, and potential loss of professional licensure and security clearance.

275. As an officer of the court, Defendant 2 bore a heightened duty not to exploit legal tools for malicious ends. Her violation of that duty caused lasting harm.

——

(D)  Relief Requested

(XVI)Plaintiff respectfully seeks:

- Compensatory damages for reputational, emotional, and economic harm;

- Punitive damages for gross abuse of legal authority under color of advocacy;

- Attorneys' fees and litigation costs;

- Such other relief as the Court deems just and proper.

## IX.  DAMAGES

### A.  Overview of Harm

276. Plaintiff brings this action not simply for personal redress, but to seek accountability for a coordinated campaign of legal, emotional, reputational, and parental harm. Defendants conspired to weaponize the judicial system, fabricate a criminal narrative, and sever Plaintiff's bond with his children—causing wide-ranging and measurable injury.

277. The following damage estimates reflect both the severity and the permanence of the harm suffered, and are well within the range of awards affirmed by New Jersey courts in cases involving emotional distress, defamation, abuse of process, and professional retaliation. Plaintiff reserves the right to adjust these estimates upon further discovery or expert analysis.

——

1.  Compensatory Damages

a)  Emotional Distress and Psychological Harm – $1,200,000

| Category | Amount |
| --- | --- |
| Emotional Distress | $1,200,000 |
| Reputational Harm | $500,000 |
| Parental Alienation / Interference | $1,000,000 |
| Economic Harm | $250,000 |
| Legal Fees | $50,000 |
| Subtotal (Compensatory) | $3,000,000 |
| Punitive Damages (3x Multiplier) | $9,000,000 |
| Total Damages Requested | $12,000,000 |

278. Plaintiff has endured prolonged psychological trauma, including depression, anxiety, sleep disruption, and loss of emotional stability, resulting directly from Defendants' coordinated actions. These include false criminal charges, manipulated recordings, custody interference, and the strategic isolation of Plaintiff from his youngest child during critical bonding periods.

279. The emotional toll of being falsely labeled abusive, deprived of familial trust, and forced into a defensive legal posture has been profound and ongoing. This category is supported by precedent emotional distress awards in New Jersey exceeding $1.4 million in comparable tort actions.

b) Reputational Harm – $500,000

280. Defendants intentionally circulated a false narrative of instability and abuse, both within legal filings and through extrajudicial communication with third parties, including Plaintiff's family. The reputational damage impaired Plaintiff's ability to maintain normal social and professional relationships and eroded public confidence in his moral and emotional character.

281. Given Plaintiff's standing as a father and clearance-holder, the reputational consequences of these coordinated attacks are substantial and ongoing.

c) Parental Alienation and Interference – $1,000,000

282. Defendants executed a deliberate pattern of parental interference, including physically separating Plaintiff from his child, manufacturing bedtime conflict, misrepresenting emotional dynamics, and suppressing the child's voice. These actions have materially harmed the parent-child bond and caused enduring emotional loss on both sides.

283. Plaintiff is entitled to compensation for lost time, bonding, security, and the developmental disruption caused to his child by Defendants' actions.

d) Economic Harm and Professional Risk – $250,000

284. Defendants' misconduct—including false allegations of domestic violence and emotional instability—placed Plaintiff's federal high-level Secret security clearance at risk and threatened his career. The resulting loss of time, work capacity, and professional opportunity, as well as the lingering fear of reputational investigation, constitute substantial economic injury.

285.

286. This amount reflects a conservative projection of lost and impaired earning capacity caused by reputational and psychological injury.

e) Legal Fees and Costs – $50,000

287. Plaintiff incurred substantial legal expenses, including prior attorney representation, document review, research, and case preparation. Even while proceeding pro se, Plaintiff has faced mounting costs related to protecting his rights and defending against coordinated legal attacks.

288. This estimate is reasonable based on industry-standard hourly rates and anticipated future costs.

_____

289. Total Compensatory Damages: $3,000,000

_____

2.  Punitive Damages – $9,000,000

290. Defendants' conduct was not merely negligent or misguided—it was calculated, malicious, and coordinated to inflict maximum harm by exploiting the legal system. Plaintiff therefore seeks punitive damages in an amount not less than three times the compensatory damages, consistent with federal precedent.

291. This multiplier reflects the need to deter future misuse of legal authority, retaliatory litigation, and the strategic exploitation of parental bonds for courtroom advantage.

_____

3.  Total Damages Sought: $12,000,000

Relief Requested

Plaintiff respectfully requests the following relief from the Court:

• Compensatory damages in the amount of $3,000,000;

• Punitive damages in the amount of $9,000,000, or such other amount as the Court deems just and proper;

• Attorneys' fees, costs of suit, and related litigation expenses;

• Declaratory and injunctive relief as appropriate;

• Any such further relief as the Court deems equitable and proper.

4.  Nature and Scope of Injury (Expanded Statement of Harm)

292. The quantified damages outlined above only partially reflect the depth and breadth of harm suffered. The following summary is provided to capture the personal, professional, and constitutional violations inflicted upon Plaintiff as a result of Defendants' coordinated misconduct:

A)  Severe Emotional Distress

293. Plaintiff endured profound and sustained psychological trauma resulting from Defendants' coordinated campaign of deceit, coercion, and abuse of legal process. This distress permeates every facet of daily life. Plaintiff lives in constant fear of police retaliation, false accusations, and family court manipulation—all while being alienated from his children and stripped of dignity in the eyes of peers, community, and professional circles.

294. The emotional toll has been severe: loss of peace, sleeplessness, panic attacks, and the sustained trauma of witnessing his children's emotional well-being systematically eroded.

B) Weaponized Legal Costs and Financial Coercion

295. Defendants used the legal system not to resolve disputes but as a weapon. Plaintiff incurred substantial legal expenses defending against knowingly false allegations—including a dismissed criminal summary offense—and navigating retaliatory civil litigation. These efforts were designed to drain Plaintiff's time, finances, and mental bandwidth.

C) Reputational and Professional Harm

296. False accusations of abuse, harassment, and emotional instability were submitted to courts, shared with legal professionals, and disseminated to third parties in Plaintiff's extended family and professional orbit. As a federal contractor with a high-level security clearance, Plaintiff's career and credibility were placed at direct risk.

D) Parental Deprivation and Emotional Alienation

297. Through falsified narratives, procedural manipulation, and emotional coercion, Defendants deprived Plaintiff of critical bonding time and emotional connection with his children. He was forced to watch his daughter cry in his arms while being removed. He was forced to watch his son be manipulated into fear and obedience. The injury to both child and parent is enduring and incalculable.

E) Loss of Income, Time, and Career Opportunity

298. Plaintiff lost irreplaceable time, 5 weeks of accrued vacation, and momentum in his professional life. Lingering fear over reputational collapse and security clearance consequences created long-term disruption.

F) Betrayal and Collusion by Trusted Individuals

299. Defendants 3 through 7, along with Defendants 8 and 9, are extended family members who knowingly coordinated with Defendant 1 to supply distorted narratives and selectively disclosed communications in support of a fabricated abuse narrative. While Plaintiff had longstanding concerns about their character and loyalty, their active participation in a scheme to destroy Plaintiff's parental and legal standing compounded the emotional damage—deepening the sense of betrayal, isolation, and humiliation.

G) Cost of Countermeasures and Personal Protection

300. To protect himself and his children, Plaintiff was forced to implement enhanced evidence preservation methods, including use of free software to record timestamped videos, backups of key interactions, and strategic digital organization of files and communications. While the tools themselves were low-cost or free, the necessity of such measures—driven entirely by Defendants' false allegations and manipulative tactics—forced Plaintiff into a state of constant vigilance and emotional exhaustion.

H) Loss of Constitutional Liberty Interests

301. Plaintiff was deprived of his fundamental liberty interest in the care, custody, and companionship of his children—a right enshrined under the Fourteenth Amendment.

This deprivation was not due to lawful adjudication, but to fraudulent filings, manipulated evidence, and abuse of legal process.

l)   Rehabilitation and Restoration Costs

302. To rebuild his personal and professional identity, Plaintiff will incur additional costs for legal remedies, reputation management, and potentially therapy—for both himself and his children.

_____

303. This statement is not a substitute for the formal damage totals provided above, but it is submitted to the Court as a fuller representation of the harm suffered and the profound personal impact of Defendants' actions.

## X. PRAYER FOR RELIEF

A.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against all named Defendants, jointly and severally, and award the following relief:

1.   Compensatory damages in the amount of $3,000,000, for emotional distress, reputational injury, parental deprivation, economic harm, and legal expenses;

2.   Punitive damages in the amount of $9,000,000, or such other amount as the Court deems just and appropriate, to punish and deter the Defendants for their malicious, coordinated, and unlawful conduct;

3.   Declaratory relief, including a judicial finding that Defendants' actions constituted fraud, abuse of process, intentional infliction of emotional distress, and other unlawful conduct as alleged herein;

4.   Injunctive relief, as necessary to prevent further harm to Plaintiff's constitutional rights and to prohibit Defendants from continuing or repeating their wrongful conduct;

5.   Attorneys' fees, expert witness fees, and litigation costs, as permitted by statute or the inherent equitable powers of this Court;

6.   Restoration and correction of official records, including any removal or annotation of false legal or criminal allegations from Plaintiff's record, reputation, or any professional review proceedings resulting therefrom;

7.   Such other and further relief as this Court may deem just, equitable, and proper under the circumstances.

## XI. JURY DEMAND

304. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Plaintiff further reserves the right to amend or supplement this Complaint as further facts are discovered through investigation or discovery, and nothing herein shall be construed as a waiver of any claim or legal theory that may later be supported by evidence.

Respectfully submitted,

Dated: August 3, 2025
Glendora, New Jersey

Eric Mitman
129 1st Avenue
Glendora, NJ 08029
Pro Se Plaintiff
Email: Eric.Mitman@gmail.com